Laramore, Judge,
delivered the opinion of the court:
This is a suit for refund of Federal income taxes for the year 1952 in which the ultimate question presented is whether the amounts paid by taxpayer to transferors of “oil allow-ables” constitute royalties so that, under section 114(b) (3)[1] of the Internal Kevenue Code of 1939, such payments must be excluded from gross income before computing taxpayer’s depletion allowance. The answer to this question depends on whether the assignors of the allowables had a depletable “economic interest” in the oil in place with respect to the oil produced under these allowables. Taxpayer asserts it is the only one entitled to claim depletion. The government urges that the transferors of the allowables have the requisite “economic interest” to entitle them to share in the depletion *460 deduction allowed by section 23 (m)[2] of the Internal Revenue Code of 1939. It is not disputed that either the taxpayer or the transferors (but not both) is entitled to claim depletion with respect to the amounts paid to the transferors for these allowables.
During the year 1952, Tidewater was the owner and operator of various oil and gas leases located in the East Texas Oil Field. That Field is under the control and supervision of the Texas Railroad Commission, which exercises authority over oil and gas drilling and production operations in the State of Texas. The Railroad Commission makes monthly determinations of the number of barrels of oil which can be produced from each well. Each well in the Field is assigned an allowable in barrels per producing day by the Railroad Commission. In addition to the proration of the number of allowable barrels to be produced per well, the Railroad Commission also establishes the number of days each month during which each well can produce. The amount so fixed is referred to as the “allowable” for each well.
The record discloses that the East Texas Oil Field is about 42 miles long (north to south) and 4 to 8 miles wide (east to west) .[3] The Field has been described as a large pool or reservoir of oil, having a natural water drive from west to east produced by encroaching subterraneal water which bounds the field on the west. Bottom-hole pressure, which forces oil to the surface through the wells drilled in the field, is created and maintained by this natural water movement. The extent and ease of production of oil are determined in the main by the water-oil contact. As oil is withdrawn, water moves *461 from the west to replace it and sweeps the oil along in the process.
As early as 1938, it was realized that withdrawal of salt water from the field must be curtailed both to prevent a drop in bottom-hole pressure (which would reduce total recoverable oil reserves and increase production costs) and to prevent pollution of fresh water supplies. Two methods of achieving this result were developed. The first was to encourage reinjection of salt water into the field; [4] the second was to encourage owners and operators to close wells producing excessive amounts of salt water and transfer production to other wells in the field which were not producing salt water.[5] These transferable rights to produce are referred to as “saltwater shut-in allowables.”
It is the second method which gives rise to the problem involved in this case. By order dated July 10, 1947, the Railroad Commission permitted the operator of any well in the field producing 100 or more barrels of water a day, to shut in that well and transfer its “allowable” to another well or wells producing less than 25 percent water. The transferred allowable would be added to the transferee’s existing allowable to increase production from the transferee’s well or wells to the extent of the allowable transferred. After the transferred allowable ceased, the transferor operator could reopen the shut-in well and resume production under the applicable Railroad Commission Order if it chose to do so.
Taxpayer acquired from other unrelated operators a number of such salt water shut-in allowables, and during the year 1952 a portion of taxpayer’s production of oil from its leases in the East Texas Oil Field was under these acquired allowables. Under the typical assignment of a shut-in allowable,[6] the assignor sold all of its rights to its allowable on specific wells and agreed that all of the oil produced by the assignee under the allowable should be property of said *462 assignee. The assignee (taxpayer) agreed to pay assignor a stated price per barrel, which, varied with the posted sales price “for each and every barrel of such transferred allowable which assignee produces * *
In its tax return for 1952, taxpayer did not claim depletion on the amounts paid to assignors; this amount was excluded from gross income in determining the base for depletion. Taxpayer later filed a timely claim for refund, asserting it was entitled to claim depletion on this amount. That claim was denied, and this suit followed.
As stated earlier, the decision in the case at bar turns on the question whether the transferors of the allowables have the requisite “economic interest” to entitle them to share in the depletion deduction allowed by section 23 (m) of the 1939 Code. The “economic interest” concept, which is used in defining the intended beneficiaries of percentage depletion, was originally formulated by the Supreme Court in Palmer v. Bender, 287 U.S. 551 (1933). The Court, aware of the necessity of creating a uniform law of taxation independent of the complexities of local law, freed the right to depletion allowance from “any special form of legal interest in the oil well” and reasoned that
[t]he language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital. [287 U.S. at 557]
As pointed out recently in Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956), the two requisites of an economic interest established by Palmer v. Bender, supra, are (1) that the taxpayer must have acquired by investment an interest in the mineral in place, and (2) that he look to the extraction and sale of the mineral for the return of this investment. Since Palmer v. Bender, quite naturally the battles in this area of tax law have been fought over whether there was an interest in the oil in place of the proper sort and whether the source of the return of the taxpayer’s capital was the extraction and sale of mineral.
*463 The major factor seriously in dispute between the parties, in the case at bar, involves the first criterion — an interest in the oil in place.[7] The government espouses two theories— either one, it contends, provides the transferors of the allow-ables the requisite interest in the oil in place so as to entitle them to claim depletion on the amounts received from taxpayer for each barrel of oil produced pursuant to the transferred allowables. One view is based on the physical and geologic characteristics of the East Texas Oil Field. The government argues that since the Field is a common pool or reservoir of oil, when taxpayer was permitted to withdraw a greater quantity of oil made possible through the acquisition of the allowables, it in effect was withdrawing the oil under the transferors’ closed wells. From this the government concludes that the economic interest in the oil in place under the closed wells which the transferors have, is sufficient to entitle them to depletion. In support of this argument the government points out that the Eailroad Commission based the amount of the “salt-water shut-in allowable” which could be transferred according to a “decline curve” which was designed to approximate the oil which could have been produced from the closed well, had it remained in operation. On the other hand, taxpayer points out that there is nothing in the record to suggest that the oil under the transferors’ leases was depleted, but on the contrary the Eailroad Commission’s Order specifically provided for the resumption of production by the transferors, after the expiration of the “allowable.” Taxpayer also points out that it is a common occurrence in the East Texas Oil Field, that within a short distance from an extremely productive well, no oil is found. *464 Moreover, the shut-in wells were scattered over most of the Field and are not limited to one region, as would be required by the government’s theory. All these factors, taxpayer argues, contradict the government’s conception that the East Texas Oil Field is a single large underlying pool of oil being tapped with equal facility by all the wells in the Field.
The general plan which the Eailroad Commission attempted to carry out by the use of the “decline curve” hi determining the amount of the “allowable” for each well, seems, at first blush, to support the government’s position. However, for the “decline curve” to carry out its intended result, i.e., that at the expiration of the “allowable” the oil under the transferor’s well would be depleted, the closed well must remain in operation. Assuming that the Eailroad Commission was justified in making such a prediction, it does not follow that the oil under a closed well would be depleted as a result of the transfer of its allowable.[8] Moreover, there is nothing in the record before us which shows that these closed wells were in fact depleted. Nor can we conclude from the evidence before us, that the amount of oil beneath taxpayer’s wells was increased as a result of the alleged flow of oil from the transferors’ closed wells.[9] All we know is that the oil which was. being extracted came from taxpayer’s wells, and since none was produced from the transferors’ closed wells, there is a fair presumption that whatever oil was under their lease when the allowable was transferred would still be there when the allowable expired. Even if the trans-ferors’ wells did not have as much oil under their leases when the “allowable” expired, there is no evidence in the record which shows that taxpayer’s production pursuant to *465 the transferred allowable was the cause of the decrease.[10] Therefore, under such circumstances, we cannot conclude that as a matter of physical and geologic reality the trans-ferrors had an interest in the oil in place under the taxpayer’s wells.
We turn now to the government’s second theory in support of its contention that the transferrors have the requisite investment in the oil in place. It argues that the facts in this case come within the rationale of Southwest Exploration Co., supra, since the assignors of the allowables transferred a property interest which was essential to taxpayer’s right to extract the oil in question.
. In this area of tax law it is difficult to single out one re-' curring factor which the courts have found to be indicative of an interest in the minerals in place. The history of' economic interest litigation is better described as the story of ascertaining which of several basic characteristics' may be omitted without eliminating the possibility of such an interest. A leading authority' on depletion,[11] after an exhaustive analysis of the jurisprudence in this area, concluded that
[i]n determining the existence of ah interest in. the minerals in place three basic ideas are involved, vis., the legal form or nature of the instrument, the degree of substantial ownership of the deposit possessed by the interest holder, and the extent and nature of his contribution to development and operation of the property. A legal property interest in the minerals, lasting for the productive life of the property, entitling its holder to significant control of the mineral deposits and beneficial enjoyment of income therefrom, and acquired as the consequence of a contribution to its development or opertion, is plainly an interest in the minerals in place. Drop *466 one of these characteristics and the solution of the issue is less certain; drop two and serious doubts arise.
We view our function in this area of tax law as one of weighing these various factors in each case and determining whether their presence or absence are indicative of or preclude the existence of an interest in the minerals in place. In so doing, we must recognize that the purpose of discovery depletion should shape the result which we reach. In this respect we must emphasize the fact that Congress sought to encourage the discovery and development of minerals. We recognize also that the Supreme Court decisions reflect a growing liberality in the application of these criteria.[12] However, we do not think it proper for us to take the lead and spearhead this apparent trend. In other words, we should not go beyond the guidelines set forth by the Supreme Court.
In this case the government equates the transferors of the “allowables” with the upland owners in Southwest Exploration who had “made an indispensable contribution of the use of real property” to the drilling for and the extraction of oil. (350 U.S. at 317). At the outset it should be noted that aside from Southwest Exploration no Supreme Court decision has found a taxpayer possessing the requisite interest in the mineral in place who did not have either a fee or a leasehold interest in the oil-producing property itself. This apparent departure from prior doctrine can best be explained on the grounds that the granting of discovery depletion in that case served the purposes for which the allowance was created. That is, the upland owners in that case contributed real property which was essential to the discovery, drilling, and extraction of the oil. Without their participation, there would have been no lease, no wells and no production. In exchange for this contribution, the upland owners acquired an interest which was measured by the producing life of the wells and they could look to the extraction and sale *467 of oil as a source of return for that interest. In other words, “[t]heir income was dependent entirely on production, and the value of their interest decreased with each barrel of oil produced.” (350 U.S. at 316) Not only were they instrumental in the acquisition of the lease, but also they “played a vital role at each successive stage of the proceedings.” (Id. at 315) The Court felt that although the upland owners did not have a legal property interest in the minerals nor did they have control over the mineral deposits, their contribution to development and operation was sufficiently significant to indicate an investment in the oil in place. However, the Court cautioned that they were not taking a drastic step from prior doctrine when they stated:
We decide only that where, in the circumstances of this case, a party essential to the drillmg for and extraction of oil has made an indispensable contribution of the use of real 'property adjacent to the oil deposits in return for a Share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received. [Emphasis added. 350 U.S. at 317]
In the case at bar, the transferors like the upland owners did not have a legal property interest in the minerals, nor did they have control over the mineral deposits. Thus their entitlement to share in the depletion allowance must be based on their contribution to the development or operation of the mineral deposits. It seems fair to say that their contribution was not as significant a contribution as was made by the upland owners in Southwest Exploration Co. Their contribution was personal property rather than real property; it was at best indispensable for the extraction of only part of the oil; it was not instrumental in the acquisition of the lease, nor was it essential to the drilling operations. Unlike Southwest Exploration Co., the interest the transferors acquired was not measured by the productive life of the wells but was to be terminated at the expiration of the “allowables.” Under these circumstances, to find in the case at bar, an interest in the minerals in place, would require us to go beyond the guidelines set forth by the Supreme Court in Southwest Exploration Co. Moreover, to do so, we think, would do *468 violence to the clear congressional purpose in granting discovery depletion.[18] Consequently, we hold that the trans-ferors of the “allowables” here in question do not have the requisite “economic interest” in the oil in place with respect to the oil produced under these allowables so as to entitle them to share in depletion allowance. Therefore, taxpayer is entitled to take the depletion allowance in question, since the amounts paid by it to these transferors do not constitute royalties and need not be excluded from taxpayer’s gross income before computing its depletion allowance for 1952.
Accordingly, judgment is entered for taxpayer with the amount of recovery to be determined pursuant to Buie 47 (c) (2) of the Buies of this court.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín Gr. White, and the briefs and argument of counsel, makes findings of fact as follows:
INTRODUCTORY STATEMENT
This is an income tax case relating to the calendar year 1952. It involves a problem concerning the plaintiff’s statutory depletion allowance for that year.
The plaintiff, Tidewater Oil Company, is an operating producer of oil in the East Texas Oil Field. The Texas law limits the amount of production from each oil well. The Bailroad Commission of Texas assigns a monthly allowable to each well, but if any well is shut down because of the production of an excessive amount of salt water, the owner of that well may assign his oil allowable to another operator, and the assignee of the allowable may produce additional oil under a lease held by him. The plaintiff acquired several allowables and thereby was able to increase its production over the amounts originally allowed to it. The assignors were paid an agreed amount by the plaintiff for each barrel of oil produced under the transferred allowables.
*469 The question presented to the court is whether the amounts which the plaintiff paid to the assignors of the transferred allowables should be regarded as an expense that does not decrease the plaintiff’s gross income from its property upon which its statutory depletion allowance is computed, or whether such payments should be regarded as royalty payments that reduce the plaintiff’s gross income from its property before its percentage depletion is computed. In deciding the question, it will be necessary to determine whether the assignors of the allowables had “an economic interest” in the oil produced by the plaintiff under the transferred al-lowables, as the quoted phrase is explained in Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956). If so, the assignors of the allowables, and not the plaintiff, were entitled to take the statutory depletion allowance with respect to the amounts that are involved in the present case. Otherwise, the plaintiff was entitled to take the statutory depletion allowance respecting such amounts.
1. The plaintiff, Tidewater Oil Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal office and place of business at 4201 Wilshire Boulevard, Los Angeles 5, California. During the calendar year 1952, the plaintiff’s principal office and place of business was at II Battery Place, New York 4, New York.
2. (a) The plaintiff filed its Federal income tax return for the calendar year 1952 with the District Director of Internal Revenue for the Lower District of Manhattan, New York. The return showed a tax liability of $1,468,439.87, all of which was paid by the plaintiff to the District Director within the time prescribed by law.
(b) Thereafter, the Commissioner of Internal Revenue determined a deficiency in the plaintiff’s Federal income taxes for the calendar year 1952 in the amount of $416,733.75. This amount, together with interest thereon in the sum of $91,681.43, was paid by the plaintiff within the time prescribed by law.
3. During the year 1952, the plaintiff was the owner and operator of various oil and gas leases located in the East Texas Oil Field in the State of Texas.
*470 4. The East Texas Oil Field is under the control and supervision of the Texas Eailroad Commission, which exercises authority over oil and gas drilling and production operations in the State. The production of oil in the East Texas Oil Field is prorated, the Eailroad Commission making monthly determinations of the number of barrels of oil which can be produced from each well. Each well in the field is assigned an allowable in barrels per producing day by the Eailroad Commission. In addition to the proration of the number of allowable barrels to be produced per well, the Eailroad Commission also establishes the number of days each month during which each well can produce. The amount so determined is referred to as the allowable for each well.
5. The East Texas Oil Field is an elongated field about 42 miles long (north to south) and 4 to 8 miles wide (east to west). It extends over portions of Upshur, Gregg, Smith, and Eusk Counties. The field, which is a large pool or reservoir, has a natural water drive, with water movement from west to east. The extent and ease of production of oil are determined in the main by the water-oil contact. As oil is withdrawn, water moves from the west to replace it and sweeps the oil along in the process. It is essential that pressures be maintained to force the oil through the oil wells to the surface. The encroaching water had trimmed the field from its original 135,000 acres in 1930 to approximately 108,000 acres in 1955.
6. As early as 1938, it was realized that withdrawal from the reservoir had to be controlled or the field would suffer a tremendous loss in oil reserves through a drop in bottom-hole pressure. By 1942, total water production from the field slightly exceeded oil production. It was realized that the rate and duration of production of oil from the field could be substantially increased and production costs reduced by limiting the amount of water removed from the field. It was also realized that salt-water production had to be curtailed and that salt water produced had to be satisfactorily disposed of to prevent pollution of fresh water supplies in the area.
*471 7. Two methods of achieving these résults were developed. The first was to reinject salt water into the field through salt-water injection wells; the second was to transfer production from wells that were producing substantial amounts of salt water to wells that were producing only small amounts of water. An operator who reinjected salt water that had been produced, or who engaged someone (principally the East Texas Salt Water Disposal Co.) to do it for him, was given an additional oil allowable for reinjecting salt water into the reservoir. An operator who closed down a well producing more than 100 barrels of salt water a day was at first permitted to transfer the allowable to other wells on the same lease approved by the Railroad Commission (Order of February 20, 1942), and later was permitted to transfer the allowable to wells on other leases in the East Texas Field (Order of July 10, 1947, set out in finding 9).
8. (a) The salt water shut-in allowables involved in this case were transferred to the plaintiff pursuant to permission granted by the Railroad Commission under authority of the Order of July 10,1947 (see finding 9). The allowable which could be transferred under this order was determined on the basis of a “decline curve,” established after a study of the declines in production of many wells in the field that had been abandoned after producing large quantities of water. The “decline curve” was designed to approximate the oil which could have been produced from the closed well had it remained in operation, down to a minimum of two barrels per producing day. For example, the “decline curves” of the allowables transferred from wells Nos. 2 and 3 of the L. L. Jones Lease (operated by Elm Oil Co.) to the plaintiff are shown in finding 12.
(b) During the years 1947-1952, approximately 1,863 wells having aggregate allowables of about 17,944 barrels of oil per day were shut down and the allowables were transferred to other leases. The salt-water production of these wells before they were shut down was about 625,465 barrels per day.
(c) The measures described previously in the findings were quite effective in maintaining the average level of pres *472 sure in the reservoir, and have added substantially to the recoverable reserves of oil in the field.
9. The Texas Railroad Commission’s Order No. 6-10,956 of July 10,1947 (see finding 7), provides as follows:
Special Order ProvidiNG eor the OptioNal Shutting DOWN op MARGINAL WELLS PRODUCING IN EXCESS OP 100 Barrels op Salt Water Per Dat and the Transferring to Other Wells op Other Leases op the Allowable Oil Production in the East Texas Field
Whereas, From testimony adduced at previous hearings, more particularly the hearings of October 6, 1941, January 20, 1942, and April 17, 1947, the Commission has found that the injection into the Woodbine sand or reservoir in the East Texas Field of salt water produced from the field is a conservation practice and will tend to arrest the decline in pressure in the field, and will tend to restore such pressure; and will increase the recovery of oil from the East Texas Field; and
_ Whereas, As a result of such findings, the Commission has issued various orders, particularly the orders of November 20,1941, February 25,1942, March 16,1943, and July 7, 1943, which are intended to promote and facilitate such injection of salt water into the Woodbine reservoir of the East Texas Field; and
Whereas, The Commission has provided in Sections (4) and (5) of Commission Order No. 6-3437, dated February 25,1942, for shutting in wells producing more than 100 barrels of salt water per day and the transfer of the allowable of such wells to other wells on the same lease; and
Whereas, From testimony presented in various hearings; particularly the hearing of October 19, 1942, and April 17, 1947, the Commission finds: that the orders above referred to and hitherto promulgated are beneficial and tend to accomplish the desired results and therefore should in nowise be revoked; that there are at this time approximately 2,000 oil wells in the East Texas Field which produce more than 100 barrels of salt water per day and that adequate salt water disposal facilities are not available, and will not be made available within a reasonable time, to return the salt water to the Woodbine reservoir.
Now, therefore, The Railroad Commission of Texas makes the following additional rules, regulations, and *473 orders with respect to the East Texas oil field which shall become effective August 1, 1947, and shall remain effective until revoked 'by the Commission.
1. Order #6-1456 issued on March 29, 1940 and Order #6-3142 issued November 20, 1941 and Order #6-3437 issued February 25, 1942 and Order #6-4571 issued March 16, 1943, and Order #20-5036 issued July 7, 1943, all on Oil and Gas Docket No. 120, and pertaining to the East Texas Field, shall remain in full force and effect, except as modified herein.
2. At the option of the operator, any marginal well producing one hundred (100) or more barrels of salt water per day may be shut in and the oil allowable transferred to another well or wells on other leases which produce less than 25% water. Any non-marginal well producing more than one hundred (100) barrels of salt water per day may be shut in and treated as if it were a marginal well producing 19.99 barrels per day, and the allowable which may be transferred shall be that which would be applicable to a 19.99 barrel marginal well.
3. The “Average Oil Production Decline Curve for the East Texas Field” heretofore adopted in Order ■ #6^-4571, and herein called Decline Curve, shall be used as a basis for determining the future allowable of each well shut in under the plan.
4. No well producing in excess of one hundred (100) barrels of salt water per day shall be shut in and the allowable transferred at the request of the operator until a test, approved by the Railroad Commission at Kilgore, has been made to determine its capacity. No tubing larger than 214" in diameter shall be used in the well to be tested and the regular lease equipment shall be utilized. The test shall be for a period of 72 continuous hours. No allowable production shall be transferred greater than the daily average production for the three month period immediately preceding the test. Where the water production is greater than four hundred (400) barrels per day, the oil volume shall be reduced to an amount representing production of oil with four hundred (400) barrels of water per day. The oil productive capacity of the well so determined shall be used as the starting point on the Decline Curve, but in no event shall exceed 19.99 barrels per day, even if the productive capacity is greater.
5. The transferred oil allowable of any well shall be declined at regular three month intervals to values *474 determined from the Decline Curve, until such time as the allowable has reached two (2.00) barrels per day, at which time the transferred oil allowable shall cease.
6. After an oil productive capacity of two (2.00) barrels per day has been reached, as determined from the Decline Curve, the well may be again tested and placed on production, but its allowable shall not again be transferred and no bonus oil will be granted for the injection of any salt water produced from the well.
7. When a well has been shut in and the allowable, based on the Decline Curve, is authorized to be produced from another lease, then right to produce that allowable shall terminate when the lease terminates on which the shut in well is located, and in the event title passes to any such well which has been shut in and placed on the Decline Curve, then the new owner of the well may either accept the rights under the Decline Curve which existed as to the previous owner, or may produce the well, taking it off the Decline Curve, but in the latter event no bonus will be given for injecting any salt water produced from the well.
8. If an operator elects to accept the Decline Curve oil allowable, he shall have the option of shutting in any well producing more than one hundred (100) barrels of water per day, and transferring its oil allowable to another well or wells on other leases in the field subject to the above provisions and to the following:
a. No well shall be allowed to produce a total of more than six (6.00) barrels per producing day of such transferred allowable.
b- Transferred allowable shall not be produced by any well making more than 25% water.
c. The transfer of oil allowable from a shut in well on one lease to another well or wells on a different lease shall only become effective on the first day of the calendar month following the date of approval by the Kilgore Office of the Railroad Commission.
d. Written applications for such transfers shall be filed with the Commission at Kilgore and shall contain the following information.
(1) The name of the operator, the name of the lease and the designated number of the well or wells to be shut in, and the daily productive capacity of oil and water of each such well.
(2) The name of the operator, the name of the lease and well or wells from which the transferred *475 allowable is to be produced, the number of barrels of transferred oil to be assigned per producing day to each well, and the percentage of water, if any, being produced from such well.
It is further ordered That this Cause be held open on the docket for such further orders as may be necessary and which may be supported by evidence of record.
10. The plaintiff acquired from other unrelated operators a number of such salt water shut-in allowables, and during the year 1952 a portion of plaintiff’s production of oil from its leases in the East Texas Oil Field was under these acquired allowables. The plaintiff was the transferee under 64 similar assignments during the year 1952.
11. The following is a typical “Assignment of Shut-in Allowable”:
Assignment of Shut-in Allowable
This agreement, made as of the First day of November, 1951, between ELM OIL COMPANY et al, hereinafter called “ASSIGNOR”, whose mailing address is P. O. Box 839, Dallas, Texas, and TIDE WATER ASSOCIATED OIL COMPANY, hereinafter called “ASSIGNEE”, with an office in Houston, Texas, WITNESSETH:
Assignor represents that it has heretofore made application to the Railroad Commission of Texas for the transfer of the oil allowable of the #2 and #3 wells on Assignor’s L. L. Jones lease which is a tract of 15 acres, more or less, out of the Corduva Survey of Rusk County, Texas, and is in the East Texas Oil Field; that the application was made pursuant to an order of the Railroad Commission of Texas, herein called “Commission”, of July 10,1947, No. 6-10,956, Oil and Gas Docket No. 120; that Assignor now owns and operates the oil and gas lease on which the wells to be shut in are located; that the application, in conformity with the procedure established by the commission, bears the approval of the District Supervisor and the District Engineer of the Commission with respect to (a) the right of Assignor to transfer, for production by other wells in said Field, the amount of oil allowable as stated in the approved application, and (b) the transfer to the Assignee, named herein, of the right to produce all of the allowable applicable to the shut-in wells.
*476 Assignor, for a valuable consideration, hereby sells, transfers and assigns unto Assignee all of Assignor’s right to produce the oil in the said Field in the amounts to be approved monthly by the Railroad Commission of Texas. Assignor represents and warrants that Assignor has the right to make this assignment and has not sold or assigned or encumbered in any way the rights herein transferred to Assignee. Assignor further represents and warrants that the lease on which the specified shut-in wells are located is in full force and effect and will be maintained by Assignor in full force and effect during the life of this agreement.
This assignment shall take effect on the First day of November, 1951. All of the oil produced by Assignee under this agreement shall be the property of Assignee.
This assignment is subject to the orders of, and the approval of said Commission, the approval and designation by the Commission of the wells and lease from which, and the time at which the allowables, the rights to produce which are herein assigned, may be produced by Assignee, and the designation, by the Commission, in its allowable schedules, of the amount of such allowables which Assignee may produce.
Subject to the other provisions hereof, Assignee agrees to pay to Assignor a sum of money equivalent to Two Dollars and Four Cents ($2.04) for each and every barrel of such transferred allowable which Assignee produces after November 1, 1951; provided, however, that if at any time hereafter during the life of this contract Tide Water Associated Oil Company has in effect in the East Texas Field an open division order posted price in excess of $2.65 per barrel for the regular oil allowables in said Field, then and in that event, and for each and every barrel of such transferred allowable which Assignee produces during the time such price in excess of $2.65 is posted, Assignee agrees to pay to Assignor a sum of money (in addition to said $2.04) equivalent to 84% of the excess of such posted price per barrel (in effect at the time such transferred allowable is produced) over and above $2.65. It is further provided that if at any time hereafter, during the life of this contract, Tide Water Associated Oil Company has in effect in the East Texas Field an open division order posted price less than $2.65 per barrel for the regular oil allowable in said Field, then and in that event, and for each and every barrel of such transferred allowable *477 which. Assignee produces during the time such price less than $2.65 is posted, Assignee agrees to pay to Assignor, in lieu of and instead of the $2.04 per barrel first hereinabove provided for, a sum of money equivalent to $2.04 less 84% of the difference between such posted price and $2.65. Accounting is to be made on or before the 25th day of each month for the transferred allowable oil produced hereunder during the preceding calendar month.
Assignor agrees that if Assignee’s or Assignor’s rights hereunder should come into dispute or litigation As-signee may withhold payment of any sum (to the extent of the amount claimed in such dispute or litigation) payable hereunder, without interest, -until final adjudication or other settlement of such dispute or litigation.
Assignor agrees to make settlement with or payment to all royalty owners and all other parties who have or acquire any interest in the allowable transferred hereunder and agrees to indemnify and save Assignee harmless from any loss, cost, damage or expense suffered or incurred by Assignee by reason of its purchase of or payment for the rights herein conveyed, or by reason of any failure of Assignor to perform any of its obligations arising hereunder.
IN witNess whereof, this instrument is executed on the date first above written.
12. Prior to the making of the assignment referred to in finding 11, the following steps were taken by Elm Oil Company and the Railroad Commission of Texas:
(a) On October 22,1951, Elm Oil Company filed with the Railroad Commission of Texas an “Application For Test To Shut In Wells Producing More Than 100 Barrels of Salt Water Per Day Pursuant To Order No. 6-10956” with respect to wells Nos. 2 and 8 of the L. L. Jones Lease. This application was “a condition precedent to shutting in the wells and transferring the oil allowable to other leases.”
(b) (1) The resulting tests made of wells Nos. 2 and 3 of the L. L. Jones Lease showed the daily average production of well No. 2 was 16.80 barrels of oil and 330.20 barrels of water, or 95.16 percent water. They showed the daily average production of well No. 3 was 17.26 barrels of oil and 342.74 barrels of water, or 95.21 percent water.
*478 (2) Based on these tests, the allowable which it was determined could be transferred from well No. 2 is shown by the following table:

Total Allowable to be Transferred 7,273.56 Bbls.
(3) The allowable which it was determined could be transferred from well No. 3 is shown by the following table:

Total Allowable to be Transferred 7,482.73 Bbls.
(c) By a document dated October 30,1951, Elm Oil Company applied to the Railroad Commission of Texas for permission to assign to the plaintiff a total allowable of 7,273.56 barrels of oil from well No. 2 of the L. L. Jones Lease and 7,482.73 barrels from well No. 3 of that lease. In this application, Elm Oil Company represented that the “lease or leases [the L. L. Jones Lease] are in full force and effect and that the oil allowable sought to be transferred has not heretofore been transferred, assigned or encumbered.”
(d) Approval of the transfer of a total allowable of 7,273.56 barrels of oil from well No. 2 and 7,482.73 barrels of oil from well No. 3 was granted by the Railroad Commission on November 7,1951.
13. After the assignment to the plaintiff of the allowables with respect to wells Nos. 2 and 3 of the L. L. Jones Lease, Elm Oil Company filed a “Monthly Application For Transfer of Allowables For Shut-In Wells Which Produced More Than 100 Barrels of Water Per Day Pursuant To Railroad Commission Order No. 6-10956.” The form on which this application was filed required Elm Oil Company to state the *479 total allowable transferred, the amount previously allocated, the amount to be produced in the ensuing month, and the balance remaining. An affidavit attached to this form required Elm Oil Company to state (among other things) that “Applicant is the owner or [sic] lease or leases on which a well or wells, as identified herein, have been tested for the purpose of being shut-in and the allowable transferred for production from another well or wells in the East Texas Field,” and that the “lease or leases are in force and effect.” The form also contained the following statement:
APPROVAL BY RAILROAD COMMISSION
The above application is approved, this the-day of-19__.
The allowable set forth above supersedes all previous allowables set for this well or wells irrespective of the manner in which such previous allowables were set, unless otherwise noted.
This approval of application constitutes authority for the purchaser or gatherer of oil produced from this well or wells to take the allowable production accumulating or accumulated from the effective date above shown until the issuance of a new schedule in which the allowable for this well or wells will be included. The presentation of this approved application in support of an SW-2 will be authority for the clearance of such accumulated production.
Deputy Supervisor, Kailroad Commission of Texas.
District Engineer, Kailroad Commission of Texas.
14. (a) On October 12,1951, Elm Oil Company wrote to Paul Snyder, one of the owners of a royalty interest in wells Nos. 1, 2, and 3 of the L. L. Jones Lease. This letter stated in part as follows:
The Texas Kailroad Commission issued Order No. 6-10956, Oil and Gas Docket 120, of July 10, 1947, whereby an operator would be permitted to shut in a well or wells in the East Texas Field that was producing more than 100 barrels of salt water per day and such well was unable to produce its allowable.
*480 Upon application the Commission would make a test of such well or wells and would determine from such test the decline curve of said well or wells.. This test involves a formula prescribed by the Commission based upon actual field experience and data as to the productive life of the well, and the remaining production to be secured therefrom. Experience has demonstrated that the curve out is quite accurate, and we do not believe that any well to which its application is authorized will be able to produce any more oil than is allowed under the curve- Thus to continue to produce the well throughout its remaining life will not result in any more royalty to you or income to us and will not be prudent opera [t]ing practice under the circumstances.
After the amount of the production has been determined by the curve out, the oil allowable may be transferred to another lease which does not produce water. The Transferred Oil Allowable is declined at regular three months intervals to values determined from the Decline Curve until such time the allowable has reached (2.00) barrels per day per well at which time the transferred oil allowable shall cease.
(b) On January 28,1952, Elm Oil Company wrote another letter to Paul Snyder, stating in part as follows:
You have already been furnished with a copy of the “Curve Out” from which you may determine the number of barrels accruing to your interest already paid for and those that will accrue in the future in so far as well No. 1 is concerned, enclosed are the figures on wells 2 and three, from theses [sic] you can determine the duration for which allowable will exist.
(c) On January 31, 1952, Paul Snyder executed a document ratifying the transfer of allowables from wells Nos. 2 and 3 of the L. L. Jones Lease to the plaintiff in accordance with the terms of the assignment of November 1, 1951 (see finding 11). This document, designated as a Eoyalty Division Order Covering Curved Out Transferred Allowable Oil, stated in part as follows:
The undersigned further agree that the payment of the royalty from the proceeds from Transferred Allowable accruing in accordance with the decline curve shall be considered and deemed, for all purposes of the lease described above, to have been produced under said lease *481 from the land covered thereby and will continue said lease in force and effect, as long as Curved Out Transfer exists, the production on which such royalty is to be paid and the duration of such royalty payments to be in accordance with and on the terms of decline curve prescribed for the lease by the Railroad Commission of Texas.
Settlement therefore shall be made by Elm Oil Company by mailing or delivering to the parties named above, their heirs, assigns, or legal representatives, on or before the 25th day of each month, a check or draft for the proceeds received for the credit of the persons named above, for Transferred Allowable Credit for the preceding month.
15. In computing the amount claimed for percentage depletion on its 1952 Federal income tax return, Elm Oil Company included in gross income the amounts received from the plaintiff with respect to the transferred allowables and excluded the amounts paid as royalties to its royalty owners. Elm Oil Company made payments to the owners of the royalty interests in wells Nos. 2 and 3 of the L. L. Jones Lease of one-eighth of the amounts received from the plaintiff. The report of the revenue agent shows no adjustment with respect to this item.
16. With the approval of the Texas Railroad Commission, the plaintiff could apply the transferred allowables to any of its oil wells in the East Texas Field to increase the production of such wells, provided the wells were producing no more than 25 percent salt water. There was no particular pattern followed by the plaintiff in selecting the well or wells to which an allowable would be transferred. For example, the transferred allowable acquired from the Elm Oil Company computed on wells Nos. 2 and 3 of the L. L. Jones Lease was applied by the plaintiff to increase the plaintiff’s production under the H. P. Leverett, Nat Bean, Lake Devernia, M. B. Hughey, M. Thompson No. 1, W. M. Clayton, and Willie Christian Leases. The shut-in wells on the L. L. Jones Lease were approximately 4.6 miles from the Leverett Lease, 9.1 miles from the Bean Lease, 19.3 miles from the Lake Devernia Lease, 14.8 miles from the Hughey Lease, 2.3 miles from the Thompson Lease, and *482 23.5 miles from the Christian Lease. The plaintiff had producing leases closer to the L. L. Jones Lease than some of the leases to which the allowables were transferred; but on the other hand, there were shut-in wells on which the plaintiff had purchased the allowables which were closer to the Christian Lease, for example, than was the L. L. Jones Lease. In general, the leases from which the allow-ables involved in this case were transferred were located along the western and northern edges of the East Texas Field, and the plaintiff’s leases to which they were transferred were located in the central or eastern portions of the field. However, some of the shut-in wells were close to some of the producing wells to which allowables were transferred.
17. With respect to the calendar year 1952, the plaintiff paid to the transferors of allowables acquired by it, as described in finding 10, the sum of $585,674 in accordance with its contracts with the transferors. In determining the amount of “gross income from the property” for 1952, the plaintiff treated this payment of $585,674 as an exclusion from gross income and thereby reduced its base on which its percentage depletion was computed by that amount.
18. The plaintiff filed a timely claim for refund based on the ground that its depletion deduction was understated due to the fact that amounts paid in 1952 for the acquisition of transferred allowables had been used erroneously to reduce the amount of the plaintiff’s gross income from the properties upon which percentage depletion is based.[1] This claim was disallowed in its entirety on June 3,1960.
19. The plaintiff is the owner of the claim involved in this proceeding, and there has been no assignment or transfer of such claim or any part thereof.
20. (a) It was agreed by the attorneys for the parties, with the approval of the commissioner, that the initial submission to the court would be on the issue of liability only, with the amount of recovery and the amount of offsets, if any, being reserved for further proceedings under Buie <fl(c) (2).
*483 ’ (b) It was further agreed that, for the purpose of making any computation that may be required under Eule 4T(c) (2), the parties will not be bound by figures contained in the memoranda regarding the pretrial conferences.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Eule 47 (c) (2) of the Eules of this court.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 26,1965, that judgment for the plaintiff be entered for $101,879.91, together with interest as provided by law.

 Section 114 provides in pertinent part as follows:
Sec. 114. Basis foe depkeciaton and depletion.
* * * # *
(b) Basis for Depletion.—
* * * * v
(3) Percentage Depletion for Oil and Gas Wells. — In the case of oil and gas wells tbe allowance for depletion under section 23 (m) shall be 27% per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * * *.

 Section 23 provides in pertinent part as follows :
Sec. 23. Deductions prom gross income. — In computing net income there shall be allowed as deductions :
*****
(m) Depletion. — In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each ease; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * * In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. * * *
For percentage depletion allowable under this subsection, see section 114(b), (3) and (4).

 See Burford v. Sun Oil Co., 319 U.S. 315 (1943) for an extensive description of the East Texas Oil Field.

 An operator "who reinjected salt water that had been produced, or who engaged someone to do it for him, was given an additional oil allowable for reinjecting salt water into the reservoir.

 An operator who closed down a well producing more than 100 barrels of salt water a day was permitted, beginning in 1942, to transfer his allowable to other wells on the same lease, and later was permitted, beginning in 1947, to transfer the allowable to other operators in the East Texas Oil Eield.

 See finding 11 where a typical assignment of a shut-in allowable is set out.

 Taxpayer, during oral argument, urged that the transferors did not meet the second requirement of “an economic interest.” This second factor has been interpreted to mean that the owner of the interest must look solely to the extraction of oil for a return of his capital, and depletion has been denied where the payments were not dependent on production. Helvering v. Elbe Oil Land Development Co., 303 U.S. 372 (1938). Taxpayer argues that it had to pay the transferors regardless of whether or not it produced oil under the “allowables.” It cites P. G. Lake, Inc. v. Commissioner, 24 T.C. 1016 (1955) in support of its contention. Although the Tax Court based its decision on the testimony of an official of the producing company, a reading of the assignment contract before us indicates that the payments to the transferors were to be based solely on production.

 We think that the use of the “decline curve” can better be explained on the grounds that the Railroad Commission, faced with the problem of curtailing the loss of bottom-hole pressure as a result of some wells producing an excessive amount of salt water, had to devise a basis for determining the amount of the allowable that could be transferred. The use of the “decline curve” was a fair basis for the estimate.

 Admittedly as a result of this conservation measure, which prevented the drop in bottom-hole pressure, taxpayer was able to obtain a greater amount of recoverable oil under its leases. But this does not mean that there was an actual increase of oil under taxpayer’s lease.

 The government argues that in the event we find that the record before us is insufficient to support the government’s contentions, taxpayer nevertheless has failed to meet its burden of proof. We think that the facts before us are sufficient to make a prima facie case in favor of taxpayer. It has shown that all the oil which was produced came from its well and none came from the transferors’ wells. This raises the presumption that the oil beneath its leases was being depleted. The burden is on the government to prove the contrary. We think that the government has not met this burden.

 Sneed, The Economic Interest — An Expanding Ooncept, 35 Texas L. Rev. 307, 355 (1957).

 This liberal trend can easily be traced commencing -with Lynch v. Al-worth-Stephens Co., 267 U.S. 364 (1925) and continuing thru Palmer v. Bender, 287 U.S. 551 (1933), Thomas v. Perkins, 301 U.S. 655 (1937), Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25 (1946) and Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956). However, the most recent pronouncement in this area, Parsons v. Smith, 359 U.S. 215 (1959) cannot be described as a continuation of this apparent trend.

 TMs is especially true, if at the expiration of the allowables, the trans-ferors were to reopen the closed wells and resume production. In that event, the transferors would be entitled to depletion twice.

 The claim was also grounded In part upon amounts which the plaintiff had allegedly paid as substitute royalties. That phase of the claim is not involved in the present litigation.