**GETTY OIL COMPANY (Successor on Merger to Tidewater Oil Company)**

**v.**

**The UNITED STATES.**[*]

**No. 326–65.**

United States Court of Claims.
July 17, 1968.

---

[*] Subsequent to the Trial Commissioner's report, the Getty Oil Company became the successor by way of merger to the Tidewater Oil Company. However, for purposes of convenience, the name Tidewater Oil Company is retained in the opinion and findings.

David W. Richmond, Washington, D. C., attorney of record, for plaintiff. Clarence T. Kipps, Jr., Miller & Chevalier, Washington, D. C., Stuart T. Peeler and Musick, Peeler & Garrett, Los Angeles, Cal., of counsel.

Donald T. Fish, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM.

This case was referred to the then Trial Commissioner Herbert N. Maletz (now a Judge of the U. S. Customs Court) with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on October 30, 1967. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The defendant complains that the Trial Commissioner erred in refusing to allow it to put its oil geological expert on the stand in surrebuttal to certain testimony on rebuttal of taxpayer's expert witness. The defendant also proffers an affidavit by its expert of what his testimony would have been, and a similar offer of proof was made at the trial. We hold that the Trial Commissioner did not abuse his discretion in refusing to permit the surrebuttal testimony and in refusing the defendant's offer of proof. The parties had exchanged narrative statements of what their experts would attempt to prove and the defendant was therefore aware of what plaintiff's expert testimony was likely to be, whether on the case-in-chief or in rebuttal. The defendant nevertheless chose not to cover certain points when its expert testified in the course of the government's presentation. In those circumstances the commissioner had the right to rule that to allow the government to make up the gap in its proof by presenting surrebuttal would in effect preclude the plaintiff from its privilege of closing the case. There was no abuse of discretion. In any event, we have considered the affidavit of the defendant's experts and find that it does not alter our conclusion on the merits of the case.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, as supplemented by the preceding paragraph, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

MALETZ, Commissioner:

This is a suit for refund of federal income taxes and interest paid for the years 1953 through 1956. Plaintiff, Tidewater Oil Company, is an operating producer of oil in the East Texas Oil Field. The rules and regulations of the Texas Railroad Commission assign a maximum allowable for production to each well in that field. However, if an

operator elects to shut down his well because of the production of an excessive amount of salt water, he may assign his oil allowable to another operator, and the assignee of the allowable may increase his production of oil under a lease held by him. During the period in issue Tidewater was the assignee of a number of allowables and thereby was able to increase its production during the years 1953 through 1956. The transferors were paid an agreed amount by Tidewater for each barrel of oil produced under the transferred allowables.

Under section 114(b) (3) of the 1939 Code, ch. 2, 53 Stat. 45, and section 613 (a) of the 1954 Code, ch. 736, 68A Stat. 208, either Tidewater or its transferors (but not both) are entitled to the statutory percentage depletion allowance on the gross income from the oil produced pursuant to the transferred allowables, and the question is whether Tidewater or its transferors are entitled to such allowance.[1] The answer turns primarily on whether the oil produced during the years 1953 through 1956 by Tidewater from its own wells pursuant to the transferred allowables depleted Tidewater's oil or whether as a result of the transfers the oil so produced by Tidewater depleted the oil from the transferors' closed wells.

Tidewater Oil Company v. United States, 339 F.2d 633, 168 Ct.Cl. 457 (1964), involved the same issue for the year 1952. In that case, defendant argued (among other things) that because of the physical and geological characteristics of the East Texas Field, when Tidewater was permitted to withdraw a greater quantity of oil through the acquisition of allowables, it in effect was withdrawing the oil under the transferors' closed wells. The court rejected this argument and held that Tidewater's oil had been depleted. The court's decision on the geological characteristics argument was based on the fact that Tidewater's production from its own wells raised a presumption that the oil beneath its leases was depleted. The court pointed out that the defendant had failed to overcome this presumption by proving (1) that Tidewater's production of oil pursuant to the transferred allowables did not deplete Tidewater's oil; (2) that the oil underlying the transferors' leases decreased during the life of the transferred allowables; and (3) that if the transferors' oil was decreased, Tidewater's production pursuant to the transferred allowables was the cause of the decrease. 339 F.2d at 636–637, 168 Ct.Cl. at 464–465, and note 10. Summing up, the court stated that "under such circumstances, we cannot conclude that as a matter of physical and geologic reality the transferors had an interest in the oil in place under * * * [Tidewater's] wells." 339 F.2d at 637, 168 Ct.Cl. at 465.

■ In the present case, the parties have stipulated that all of the oil produced pursuant to the transferred allowables was produced from Tidewater's wells. Under the court's prior decision, this fact makes out a prima facie case for Tidewater. Thus the problem is whether in the present case the defendant has rebutted the presumption by proving the three physical and geological characteristics that it did not prove in the prior case.

■ The facts are set out in detail in the accompanying findings. The record, in summary, shows that defendant has failed to prove that Tidewater's production of oil pursuant to the transferred allowables did not deplete Tidewater's

---

1. Under these provisions of the Code, there is allowed as a deduction in computing taxable income from oil and gas wells a depletion allowance of 27½ per cent of the gross income from the property, "excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." Whether the amounts paid by Tidewater to the transferors of the allowables constituted royalties and hence excluded from Tidewater's depletion computation depends on whether the transferors had an "economic interest" in the oil in place with respect to the oil produced under the allowables. E. g., Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933).

oil and that the oil underlying any of the transferors' wells was decreased during the life of the transferred allowables. The evidence indicates instead that the physical and geological characteristics of the East Texas Field are such that the oil did not in fact decrease from under the transferors' leases during the period the allowables were transferred. But even if it were to be assumed that there was such a decrease, the record demonstrates that defendant has failed to prove that Tidewater's production pursuant to the transferred allowables was the cause of the decrease. It is therefore concluded that Tidewater's production of oil during the years 1953 through 1956 pursuant to the transferred allowables depleted Tidewater's oil reserves.

■ Defendant further argues that the transferors retained a royalty interest in the oil produced by Tidewater pursuant to the transferred allowables and that the payments they received from Tidewater must, therefore, be excluded from Tidewater's depletion base. Recognizing that the first requisite for such an interest is that the transferors "must have acquired by investment an interest in the mineral in place,"[2] defendant relies on Breeding and Burton, Income Taxation of Oil and Gas Production, section 203, which defines a royalty interest as "a right to oil and gas in place that entitles its owner to a specified fraction, in kind or in value, of the total production from the property, free of expense of development and operation."

Defendant's position is that the transferors are royalty owners within the scope of this definition. It states (i) that since the transferors owned and/or operated the shut-in wells prior to the transfer, "they had an interest in the fee from which the oil was being produced"; and (ii) that the order of the Texas Railroad Commission and the assignment itself required the transferors to maintain their leases in full force and effect during the life of the transferred allowables. "Thus," defendant argues, "the transferor is under an obligation to retain his interest in the fee during the period of the assignments, thereby meeting the first definitional requirement of a royalty." Further, defendant points out that under the provisions of the assignment contract, the transferors are to receive a stipulated amount for each barrel of transferred allowable that Tidewater produces, which payment is to increase or decrease in specified amounts in the event of changes in the market price. Since the transferor is thus entitled to a specified fraction of the value of the total production, defendant states that the second definitional criterion of a royalty interest has been satisfied.[3]

The argument has no merit, however. Under the definition of a royalty on which defendant relies, the royalty owner must have *a right to the oil in place* and a share of the production *from the property* in which he possesses that right. The obvious royalty owners in this case

**2.** Tidewater Oil Company v. United States, supra, 339 F.2d at 635, 168 Ct.Cl. at 462. See Palmer v. Bender, supra, 287 U.S. at 557, 53 S.Ct. at 225.

**3.** In the prior Tidewater case, the court held that the transferors' contribution to the development or operation of the oil in place was not such—within the guidelines established by Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956)—as to give them the requisite "economic interest" in the oil which would entitle them to share in the depletion allowance. 339 F.2d 633, 637–639, 168 Ct. Cl. 457, 465–468. The court's decision

on this phase of the case has been reaffirmed and applied in CBN Corporation v. United States, 364 F.2d 393, 176 Ct.Cl. 861 (1966), cert. denied, 386 U.S. 981, 87 S.Ct. 1284, 18 L.Ed.2d 228 (1967). See also Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965). Collateral estoppel does not bar re-examination of the issue, however, since in the later tax years involved here Tidewater executed 48 new assignment contracts which are separable from those involved in the first proceeding. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 601–602, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

are Tidewater's lessors to whom Tidewater paid a one-eighth royalty with respect to every barrel of oil produced from their land, including the oil produced pursuant to the transferred allowables. It is of course true that the transferors had an interest in the fee in the wells which were shut in. The fact that the order of the Railroad Commission required the transferors to maintain their leases in full force and effect during the life of the transfers hardly suffices to convert this interest into an interest in Tidewater's oil in place.[4] Tidewater and its lessors owned all the oil in place underlying Tidewater's leases prior to the transferred allowables, and Tidewater did not grant the transferors any interest in Tidewater's oil in place. The transferors still owned the oil in place under their leases and were free to reopen their wells and produce oil.

The transferors had not invested anything in the property from which Tidewater produced the oil; they had no legal relationship whatever with the landowner from whose land Tidewater produced oil; and Tidewater's lessors (landowners) had a royalty interest in their own oil being produced by Tidewater, whether the production was under an ordinary allowable or a transferred allowable. When the transferors transferred their allowables to Tidewater, the transferors had no idea from which wells or from what "mineral in place" the amount of oil specified in the transferred allowables would be produced. This was a matter between Tidewater and the Railroad Commission. Neither by its transfer of its allowable nor by the order of the Railroad Commission requiring a transferor to maintain its lease with its landowner during the life of the transferred allowable did the transferor "acquire by investment an interest in the mineral in place" under the land of a landowner whose identity it did not even know.

It follows that Tidewater is entitled to the depletion allowance in question since the amounts paid by it to the transferors of the allowables did not constitute royalties and hence need not be excluded from its gross income before computing its depletion allowance for the years 1953 through 1956.

---

4. The Railroad Commission's order requiring a transferor to maintain his lease is seemingly designed to preclude possible double allowables. The transferor became entitled to an allowable while it was operating the lease which had now been shut in. The allowable has been transferred. If the transferor abandoned its lease and the landowner leased to another operator, there would be a double allowable. This is prevented by requiring the lease to be maintained during the life of the transfer.