Pee Cueiam :
This case was referred to the then Trial Commissioner Herbert N. Maletz (now a Judge of the U.S. Customs Court) with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57(a). The commissioner has done so in an opinion and report filed on October 30, 1967. Exceptions to the commissioner’s opinion, findings and recommended conclusion of law were filed by defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.
The defendant complains that the Trial Commissioner erred in refusing to allow it to put its oil geological expert on the stand in surrebuttal to certain testimony on rebuttal of taxpayer’s expert witness. The defendant also proffers an affidavit by its expert of what his testimony would have been, and a similar offer of proof was made at the trial. We hold that the Trial Commissioner did not abuse his discretion in refusing to permit the surrebuttal testimony and in refusing the defendant’s offer of proof. The parties had exchanged narrative statements of what their experts would attempt to prove and the defendant was therefore aware of what plaintiff’s expert testimony was likely to be, whether on the casein-chief or in rebuttal. The defendant nevertheless chose not to cover certain points when its expert testified in the course of the government’s presentation. In those circumstances the commissioner had the right to rule that to allow the government to make up the gap in its proof by presenting sur-rebuttal would in effect preclude the plaintiff from its privilege of closing the case. There was no abuse of discretion. In any event, we have considered the affidavit of the defendant’s experts and find that it does not alter our conclusion on the merits of the case.
*247 Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, as supplemented by the preceding paragraph, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47 (c).
OPINION OP COMMISSIONER
Maletz, Oommassioner:
This is a suit for refund of federal income taxes and interest paid for the years 1953 through 1956. Plaintiff, Tidewater Oil Company, is an operating producer of oil in the East Texas Oil Field. The rules and regulations of the Texas Railroad Commission assign a maximum allowable for production to each well in that field. However, if an operator elects to shut down his well because of the production of an excessive amount of salt water, he may assign his oil allowable to another operator, and the assignee of the allowable may increase his production of oil under a lease held by him. During the period in issue Tidewater was the assignee of a number of allowables and thereby was able to increase its production during the years 1953 through 1956. The transferors were paid an agreed amount by Tidewater for each barrel of oil produced under the transferred allowables.
Under section 114(b) (3) of the 1939 Code, ch. 2, 53 Stat. 45, and section 613(a) of the 1954 Code, ch. 736, 68A Stat. 208, either Tidewater or its transferors (but not both) are entitled to the statutory percentage depletion allowance on the gross income from the oil produced pursuant to the transferred allowables, and the question is whether Tidewater or its transferors are entitled to such allowance.[1] The *248 answer turns primarily on whether the oil produced during the years 1953 through 1956 by Tidewater from its own wells pursuant to the transferred allowables depleted Tidewater’s oil- or whether as a result of the transfers the oil so produced by Tidewater depleted the oil from the transferors’ closed wells.
Tidewater Oil Company v. United States, 168 Ct. Cl. 457, 339 F. 2d 633 (1964), involved the same issue for the year 1952. In that case, defendant argued (among other things) that because of the physical and geological characteristics of the East Texas Field, when Tidewater was permitted to withdraw a greater quantity of oil through the acquisition of al-lowables, it in effect was withdrawing the oil under the trans-ferors’ closed wells. The court rejected this argument and held that Tidewater’s oil had been depleted. The court’s decision on the geological characteristics argument was based on the fact that Tidewater’s production from its own wells raised a presumption that the oil beneath its leases was depleted. The court painted out that the defendant had failed to overcome this presumption by proving (1) that Tidewater’s production of oil pursuant to the transferred allow-ables did not deplete Tidewater’s oil; (2) that the oil underlying the transferors’ leases decreased during the life of the transferred allowables; and (3) that if the transferors’ oil was decreased, Tidewater’s production pursuant to the transferred allowables was the cause of the decrease. 168 Ct. Cl. at 464-65, and note 10, 339 F. 2d at 636-37, and note 10. Summing up, the court stated that “under such circumstances, we cannot conclude that as a matter of physical and geologic reality the tranferors had an interest in the oil in place under * * * [Tidewater’s] wells.” 168 Ct. Cl. at 465, 339 F. 2d at 637.
In the present case, the parties have stipulated that all of the oil produced pursuant to the transferred allowables was produced from Tidewater’s wells. Under the court’s prior decision, this fact makes out a prima facie case for Tidewater. Thus the problem is whether in the present case the defendant has rebutted the presumption by proving the *249 three physical and geological characteristics that it did not prove in the prior case.
The facts are set out in detail in the accompanying findings. The record, in summary, shows that defendant has failed to prove that Tidewater’s production of oil pursuant to the transferred allowables did not deplete Tidewater’s oil and that the oil underlying any of the transferors’ wells was decreased during the life of the transferred allowables. The evidence indicates instead that the physical and geological characteristics of the East Texas Field are such that the oil did not in fact decrease from under the transferors’ leases during the period the allowables were transferred. But even if it were to be assumed that there was such a decrease, the record demonstrates that defendant has failed to prove that Tidewater’s production pursuant to the transferred allow-ables was the cause of the decrease. It is therefore concluded that Tidewater’s production of oil during the years 1953 through 1956 pursuant to the transferred allowables depleted Tidewater’s oil reserves.
Defendant further argues that the transferors retained a royalty interest in the oil produced by Tidewater pursuant to the transferred allowables and that the payments they received from Tidewater must, therefore, be excluded from Tidewater’s depletion base. Recognizing that the first requisite for such an interest is that the transferors “must have acquired by investment an interest in the mineral in place,” [2] defendant relies on Breeding and Burton, Income Taxation of Oil and Gas Production, section 203, which defines a royalty interest as “a right to oil and gas in place that entitles its owner to a specified fraction, in kind or in value, of the total production from the property, free of expense of development and operation.” Defendant’s position is that the transferors are royalty owners within the scope of this definition. It states (i) that since the transferors owned and/or operated the shut-in wells prior to the transfer, “they had an interest in the fee from which the oil was being produced”; *250 and (ii) that the order of the Texas Eailroad Commission and the assignment itself required the transferors to maintain their leases in full force and effect during the life of the transferred allowables. “Thus,” defendant argues, “the transferor is under an obligation to retain his interest in the fee during the period of the assignments, thereby meeting the first definitional requirement of a royalty.” Further, defendant points out that under the provisions of the assignment contract, the transferors are to receive a stipulated amount for each barrel of transferred allowable that Tidewater produces, which payment is to increase or decrease in specified amounts in the event of changes in the market price. Since the transferor is thus entitled to a specified fraction of the value of the total production, defendant states that the second definitional criterion of a royalty interest has been satisfied.[3]
The argument has no merit, however. Under the definition of a royalty on which defendant relies, the royalty owner must have a right to the oil m place and a share of the production from the property in which he possesses that right. The obvious royalty owners in this case are Tidewater’s lessors to whom Tidewater paid a one-eighth royalty with respect to every barrel of oil produced from their land, including the oil produced pursuant to the transferred allowables. It is of course true that the transferors had an interest in the fee in the wells which were shut in. The fact that the order of the Eailroad Commission required the transferors to maintain their leases in full force and effect during the life of the transfers hardly suffices to convert this interest into *251 an interest in Tidewater’s oil in place.[4] Tidewater and its lessors owned all the oil in place underlying Tidewater’s leases prior to the transferred allowables, and Tidewater did not grant the transferors any interest in Tidewater’s oil in place. The transferors still owned the oil in place under their leases and were free to reopen their wells and produce oil.
The transferors had not invested anything in the property from which Tidewater produced the oil; they had no legal relationship whatever with the landowner from whose land Tidewater produced oil; and Tidewater’s lessors (landowners) had a royalty interest in their own oil being produced by Tidewater, whether the production was under an ordinary allowable or a transferred allowable. When the transferors transferred their allowables to Tidewater, the transferors had no idea from which wells or from what “mineral in place” the amount of oil specified in the transferred allowables would be produced. This was a matter between Tidewater and the Railroad Commission. Neither by its transfer of its allowable nor by the order of the Railroad Commission requiring a transferor to maintain its lease with its landowner during the life of the transferred allowable did the trans-feror “acquire by investment an interest in the mineral in place” under the land of a landowner whose identity it did not even know.
It follows that Tidewater is entitled to the depletion allowance in question since the amounts paid by it to the transferors of the allowables did not constitute royalties and hence need not be excluded from its gross income before computing its depletion allowance for the years 1953 through 1956.
FINDINGS or Fact
1. Plaintiff is a Delaware corporation with its principal office and place of business at 4201 Wilshire Boulevard, Los *252 Angeles, California. During the calendar years 1953 througb 1956, its principal office and place of business was at 79 New Montgomery Street, San Francisco, California 94120.
2. Plaintiff timely filed its federal income tax return for each of the calendar years 1953 through 1956 and paid the tax shown due thereon. Thereafter the Commissioner of Internal Eevenue determined that there was a deficiency in plaintiff’s federal income taxes for each of the calendar years 1953 through 1956. The deficiencies were paid by plaintiff.
3. Plaintiff timely filed its claims for refund of federal income taxes for the calendar years 1953 through 1956, claiming percentage depletion deductions on the ground that amounts paid or incurred by plaintiff during the years 1953 through 1956 on account of transferred allowables in the East Texas Oil Field did not reduce the amount of its gross income from the properties upon which percentage depletion is based. The Commissioner of Internal Eevenue disallowed these claims for refund by certified letters dated October 15, 1965. Upon this disallowance timely suit was brought.
4. During the years 1953 through 1956, plaintiff was the owner and operator of various oil and gas leases located in the East Texas Oil Field in the State of Texas.
5. The East Texas Field is under the control and supervision of the Texas Eailroad Commission which exercises authority over oil and gas drilling and production operations in the State in order to conserve oil, maximize production and minimize waste. To accomplish these purposes, the production of oil in the East Texas Field is prorated under a system whereby the Eailroad Commission makes monthly determinations of the number of barrels of oil which can be produced from each well. Each well in the field is assigned an allowable in barrels per producing day by the Eailroad Commission. In addition to the proration of the number of allowable barrels to be produced per well, the Eailroad Commission also establishes the number of days each month during which each well can produce based on a market-demand factor. The amount so determined is referred to as the allowable for each well. Those wells with a capacity of less than 20 barrels of oil a day are called marginal wells, and *253 the operators of such wells are permitted to produce their allowables every day without reduction for the market-demand factor.
6. The East Texas Field is an elongated field about 42 miles long (north to south) and 4 to 8 miles wide (east to west). It extends over portions of Upshur, Gregg, Smith and Rusk Counties. The field has a natural water drive, with water movement from west to east. The field, commonly referred to as a reservoir, is not a basin or pool of oil, and it cannot be tapped with equal facility by all the wells in the field. The oil occurs inside the tiny pore channels of sand formations which have the consistency of compacted beach sand. The porosity of the sand formations (i.e., ability to store fluids) is between 25 per cent and 27 per cent, and the permeability (i.e., ability to transmit fluids) is unusually high. The sand formations in the field are not uniform but are interspersed with thin impermeable shale beds which occur at random intervals and tend to be parallel to the floor of the reservoir. These shale beds become progressively more extensive from west to east. Thus, in the western part of the field the formation consists of approximately 70 per cent sand and 30 per cent shale; toward the middle of the field it consists of between 60 and 80 per cent sand and from 40 to 20 per cent of shale; and towards the east it consists of 40 to 60 per cent sand and 60 to 40 per cent shale. Because of these shale inclusions, oil is located in different layers throughout the field.
7. Oil and water occur in a continuous phase throughout the porous spaces of the sand. Oil is produced in the field by means of a strong natural water drive which moves from west to east. As oil is produced, a vacuum is created which is filled by a similar volume of oil from the western portion of the field, which in turn is replaced by either a similar volume of oil or water. The water drive occurs because the production of oil causes a drop in pressure which institutes a chain reaction throughout the field. For maximum production it is essential that the water pressure be maintained. The water drive displaces the oil and sweeps the remaining oil ahead of it as it moves toward the producing wells. The water does not move the oil through the sand in the manner of one *254 large piston, however, due to the varying degrees of permeability of the sand formations and the less than 100 per cent effective water drive. The water movement from west to east is an extremely slow process. For example, in some places the water line moved eastward 1% miles in 30 years, or an average of 264 feet a year, and in some places did not move at all during the years involved here.
8. As oil is pushed ahead of the water, small globules or droplets of oil, spherical in shape, separate from the main body of oil and become isolated between the sand grains. These oil globules are known as residual oil which cannot be produced under presently known conditions.
9. The field' may be divided into three general areas, i.e., the plugged and abandoned area; the wet oil area — so-called because the oil is produced with varying amounts of salt water; and the dry oil area where the oil is produced with almost no salt water. The plugged and abandoned area commences on the west side of the field and extends eastward in an irregular manner to the wet oil area. The wet oil area extends eastward in an irregular manner to the dry oil area.
10. Most of the oil wells to the west of the plugged and abandoned line have been watered out and plugged and abandoned. Although surrounded by plugged and abandoned wells, there are over 40 islands located west of the plugged and abandoned line and across the entire length of the field from north to south, each of which contains wells which still were producing oil in commercial quantities in 1960. Many of those wells were still producing oil in commercial quantities in 1966.
11. The Texas Railroad Commission’s Order No. 6-10,956, dated July 10,1947, provides as follows:
SPECIAL ORDER PROVIDING FOR THE OPTIONAL SHUTTING DOWN OF MARGINAL WELLS PRODUCING IN EXCESS OF 100 BARRELS OF SALT WATER PER DAT AND THE TRANSFERRING TO OTHER WELLS OF OTHER LEASES OF THE ALLOWABLE OH PRODUCTION IN THE EAST TEXAS FIELD
Whereas, From testimony adduced at previous hearings, more particularly the hearings of October 6,1941, January 20, 1942, and April 17, 1947, the Commission has found that the injection into the Woodbine sand or *255 reservoir in the East Texas Field of salt water produced from the field is a conservation practice and will tend to arrest the decline in pressure in the field, and will tend to restore such pressure; and will increase the recovery of oil from the East Texas Field; and
WiieReas, As a result of such findings, the Commission has issued various orders, particularly the orders of November 20, 1941, February 25, 1942, March 16, 1943, and July 7, 1943, which are intended to promote and facilitate such injection of salt water into the Woodbine reservoir of the East Texas Field, and
Whereas, The Commission has provided in Sections (4) and (5) of Commission Order No. 6-3437, dated February 25, 1942, for shutting in wells producing more than 100 barrels of salt water per day and the transfer of the allowable of such wells to other wells on the same lease; and
WheReas, From testimony presented in various hearings, particularly the hearing of October 19, 1942, and April 17, 1947, the Commission finds: that the orders 'above referred to and hitherto promulgated are beneficial and tend to accomplish the desired results and therefore should in nowise be revoked; that there are at this time approximately 2,000 oil wells in the East Texas Field which produce more than 100 barrels of salt water per day and that adequate salt water disposal facilities are not available, and will not be made available within a reasonable time, to return the salt water to the Woodbine reservoir.
Now, thereeore, The Kailroad Commission of Texas makes the following additional rules, regulations, and orders with respect to the East Texas oil field which shall become effective August 1, 1947, and shall remain effective until revoked by the Commission.
1. Order #6-1456 issued on March 29, 1940 and Order #6-3142 issued November 20, 1941 and Order #6-3437 issued February 25, 1942 and Order #6-4571 issued March 16, 1943, and Order #20-5036 issued July 7, 1943, all on Oil and Gas Docket No. 120, and pertaining to the East Texas Field, shall remain in full force and effect, except as modified herein.
2. At the option of the operator, any marginal well producing one hundred (100) or more barrels of salt water per day may be shut in and the oil allowable transferred to another well or wells on other leases which produce less than 25% water. Any non-marginal well producing more than one hundred (100) barrels of salt water per day may be shut in and treated as if it were a *256 marginal well producing 19.99 barrels per day, and the allowable which, may be transferred shall be that which would be applicable to a 19.99 barrel marginal well.
3. The “Average Oil Production Decline Curve for the East Texas Field” heretofore adopted in Order #6-4571, and herein called Decline Curve, shall be used as a basis for determining the future allowable of each well shut in under the plan.
4. No well producing in excess of one hundred (100) barrels of salt water per day shall be shut in and the allowable transferred at the request of theoperator until a test, approved by the Nailroad Commission at Kil-gore, has been made to determine its capacity. No tubing larger than 2%" in diameter shall be used in the well to be tested and the regular lease equipment shall be utilized. The test shall be for a period of 72 continuous hours. No allowable production shall be transferred greater than the daily average production for the three month period immediately preceding the test. Where the water production is greater than four hundred (400) barrels per day, the oil volume shall be reduced to an amount representing production of oil with four hundred (400) barrels of water per day. The oil productive capacity of the well so determined shall be used as the starting point on the Decline Curve, but in no event shall exceed 19.99 barrels per day, even if the productive capacity is greater.
5. The transferred oil allowable of any well shall be declined at regular three month intervals to values determined from the Decline Curve, until such time as the allowable has reached two (2.00) barrels per day, at which time the transferred oil allowable shall cease.
6. After an oil productive capacity of two (2.00) barrels per day has been reached, as determined from the Decline Curve, the well may be again tested and placed on production, but its allowable shall not again be transferred and no bonus oil will be granted for the injection of any salt water produced from the well.
7. When a well has been shut in and the allowable, based on the Decline Curve, is authorized to be produced from another lease, then right to produce that allowable shall terminate when the lease terminates on which the shut in well is located, and in the event title passes to any such well which has been shut in and placed on the Decline Curve, then the new owner of the well may either accept the rights under the Decline Curve which existed as to the previous owner, or may produce the well, taking *257 it off tbe Decline Curve, but in the latter event no bonus will be given for injecting any salt water produced from the well.
8. If an operator elects to accept the Decline Curve oil allowable, he shall have the option of shutting in any well producing more than one hundred (100) barrels of water per day, and transferring its oil allowable to another well or wells on other leases in the field subject to the above provisions and to the following:
a. No well shall be allowed to produce a total of more than six (6.00) barrels per producing day of such transferred allowable.
b. Transferred allowable shall not be produced by any well making more than 25% water.
c. The transfer of oil allowable from a shut in well on one lease to another well or wells on a different lease shall only become effective on the first day of the calendar month following the date of approval by the Kilgore Office of the Railroad Commission.
d. Written applications for such transfers shall be filed with the Commission at Kilgore and shall contain the following information.
(1) The name of the operator, the name of the lease and the designated number of the well or wells to be shut in, and the daily productive capacity of oil and water of each such well.
(2) The name of the operator, the name of the lease and well or wells from which the transferred allowable is to be produced, the number of barrels of transferred oil to be assigned per producing day to each well, and the percentage of water, if any, being produced from such well.
It is further ordered That this cause be held open on the docket for such further orders as may be necessary and which may be supported by evidence of record.
12. The Average Oil Production Decline Curve (decline curve) for the East Texas Field referred to in paragraph 3 of the Railroad Commission Order was developed on the basis of a study of the performance of about 500 wells on the west side of the field which had experienced increasing water production and decreasing oil production during the period 1936-1942. Those wells had not been shut in when they began to produce large quantities of salt water, but had produced to the limit of their economic feasibility; they had then been plugged and abandoned. The actual number of barrels *258 of oil produced by those wells and the period of such production were used to formulate the decline curve. There was a wide variation in the rate of decline of oil production once the wells started producing in excess of 100 barrels of water per day. The decline curve is based on the average rate of decline of the 500 wells studied and, as finally established, represents a true average of a representative and fair sampling of the water-producing oil wells. The decline curve, in other words, reflects on the average the amount of oil a water-producing well would continue to produce if it stayed in production, and as recently as 1950 was proven to be quite accurate in this respect.
13. The decline curve is used to determine the amount of the allowable that may be transferred. For example, if the shut-in well tested at a capacity of 10 barrels of oil per day at the time of shut in, the well would be placed on the decline curve at 10 barrels per day, and the decline curve rate of decline would be applied to determine the amount of the allowable that could be transferred. The decline curve was thus formulated as a method for computing the amount of a transferred allowable; it gives no indication of the amount of oil which might remain under a well or in its vicinity after the well is shut in and the allowable transferred.
14. When an oil well starts producing 100 barrels or more of salt water per day, an operator is permitted by the Nail-road Commission either to reinject the water into the subsurface below the original oil-water contact — for which he receives a bonus allowable — o,r to place the well on the decline curve, shut in the well, and transfer its allowable to another well.
15. By the time a well produces 100 barrels of salt water per day, the encroaching water has already swept to the east substantially all of the oil that is going to be swept from the vicinity of the well. The oil that remains is by-passed oil, i.e., oil which is trapped behind the advancing water front. By-passed oil, unlike residual oil, can be and is produced. It results from such geological factors as the trapping of oil against the roof of the reservoir both above and below the original oil-water contact; the trapping of oil in local high points along the roof of the reservoir; the trapping of oil *259 against tbe floor of tbe reservoir; tbe trapping o.f oil in a sand lens wedged between two sbale beds which intersect at a point toward tbe east side of tbe field; and tbe trapping of oil in zones of low water permeability. By-passed oil bas a very slight eastward movement. This movement is much slower than tbe movement of the main body (i.e., tbe dry oil area) which means that it is not possible for tbe by-passed oil to rejoin tbe main body. As a practical matter, because of its extremely slight movement, by-passed oil can be produced only by wells in its immediate vicinity.
16. Prior to making an assignment, the transferor must file an application with the Texas Railroad Commission. Tbe well or wells sought to be placed on tbe decline curve and shut in are then tested. Based on these tests, the Texas Railroad Commission establishes a shut-in allowable which can be transferred to another well owned by the transferor or to another operator in the field. In order to, transfer this shut-in oil allowable to a well not owned or operated by the owner of the well to be shut in, an application must be filed with the Texas Railroad Commission.
17. Once an operator places his well on the decline curve and transfers or assigns the allowable production as computed by use of the decline curve, the well, in most instances, is plugged and abandoned because the operator feels that it is no longer economical to operate that well. It is a difficult job to reopen a plugged well.
18. Some wells are merely shut in, i.e., put in a suspended state rather than plugged. A shut-in well may later be reopened without the physical difficulty or economic burden inherent in unplugging a well. It is not particularly expensive to reopen a shut-in well.
19. After an operator places his well on the decline curve, he may assign or transfer the allowable under the terms of the Railroad Commission’s Order. The assignment is effective until the allowable has been completely produced by the transferee or the transferor’s lease has been abandoned.
20. Plaintiff acquired from other unrelated operators a number of salt water shut-in allowables, and during the years 1953 through 1956, a portion of plaintiff’s production of oil from its leases in the East Texas Field was under these *260 acquired allowables. Plaintiff was the transferee under 48 similar assignments during the years 1953 through. 1956.
21. In addition to the contracts in effect in 1952, many of which continued in effect for subsequent years, plaintiff entered into the following number of new similar contractual arrangements under which it was assigned additional shut-in allowables :
1953_ 17
1954_ 11
1955_ 14
1956_ 6
22. The following is a typical “Assignment of Shut-in Allowable”:
ASSIGNMENT OP SHUT-IN ALLOWABLE
This Agreement, made as of the First day of November, 1951, between ELM OIL COMPANY et al., hereinafter called “Assignok”, whose mailing address is P. O. Box 839, Dallas Texas, and TIDE WATER ASSOCIATED OIL COMPANY, hereinafter called “Assignee”, with an office in Houston, Texas, Witnesseth:
Assignor represents that it has heretofore made application to the [Railroad Commission of Texas for the transfer of the oil allowable of the #2 and #3 wells on Assignor’s L. L. Jones lease which is a tract of 15 acres, more or less, out of the Corduva Survey of Husk County, Texas, and is in the East Texas Oil Field; that the application was made pursuant to an order of the [Railroad Commission of Texas, herein called “Commission”, of July 10,1941, No. 6-10,956, Oil and Gas Docket No. 120; that Assignor now owns and operates the oil and gas lease on which the wells to be shut in are located; that the application, in conformity with the procedure established by the commission, bears the approval of the District Supervisor and the District Engineer of the Commission with respect to (a) the right of Assignor to transfer, for production by other wells in said Field, the amount of oil allowable as stated in the approved application, and (b) the transfer to the Assignee, named herein, of the right to produce all of the allowable applicable to the shut-in wells.
Assignor, for a valuable consideration, hereby sells, transfers and assigns unto Assignee all of Assignor’s right to produce the oil in the said Field in the amounts to be approved monthly by the Railroad Commission of Texas. Assignor represents and warrants that As *261 signor has the right to make this assignment and has not sold or assigned or encumbered in any way the rights herein transferred to Assignee. Assignor further represents and warrants that the lease on which the specified shut-in wells are located is in full force and effect and will be maintained by Assignor in full force and effect during the life of tins agreement.
This assignment shall take effect on the First day of November, 1951. All of the oil produced by Assignee under this agreement shall be the property of Assignee.
This assignment is subject to the orders of, and the approval of said Commission, the approval and designation by the Commission of the wells and lease from which, and the time at which the allowables, the rights to produce which are herein assigned, may be produced by Assignee, and the designation, by the Commission, in its allowable schedules, of the amount of such allow-ables which Assignee may produce.
Subject to the other provisions hereof, Assignee agrees to pay to Assignor a sum of money equivalent to Two Dollars and Four Cents ($2.04) for each and every barrel of such transferred allowable which Assignee produces after November 1, 1951; provided, however, that if at any time hereafter during the life of this contract Tide Water Associated Oil Company has in effect in the East Texas Field an open division order posted price in excess of $2.65 per barrel for the regular oil allowables in said Field, then and in that event, and for each and every barrel of such transferred allowable which As-signee produces during the time such price in excess of $2.65 is posted, Assignee agrees to pay to Assignor a sum of money (in addition to said $2.04) equivalent to 84% of the excess of such posted price per barrel (in effect at the time such transferred allowable is produced) over and above $2.65. It is further provided that if at any time hereafter, during the life of this contract, Tide Water Associated Oil Company has in effect in the East Texas Field an open division order posted price less than $2.65 per barrel for the regular oil allowable in said Field, then and in that event, and for each and every barrel of such transferred allowable which Assignee produces during the time such price less than $2.65 is posted, Assignee agrees to pay to Assignor, in lieu of and instead of the $2.04 per barrel first hereinabove provided fon a sum of money equivalent to $2.04 less 84% of the difference between such posted price and $2.65. Accounting is to be made on or before the 25th day of each month for the transferred allowable oil produced hereunder during the preceding calendar month.
*262 Assignor agrees that if Assignee’s or Assignor’s rights hereunder should come into dispute or litigation As-signee may withold payment of any sum (to the extent of the amount claimed in such dispute or litigation) payable hereunder, without interest, until final adjudication or other settlement of such dispute or litigation.
Assignor agrees to make settlement with or payment to all royalty owners and all other parties who have or acquire any interest in the allowable transferred hereunder and agrees to indemnify and save Assignee harmless from any loss, cost, damage or expense suffered or incurred by Assignee by reason of its purchase of or payment for the rights herein conveyed, or by reason of any failure of Assignor to perform any of its obligations arising hereunder.
IN witNess whereop, this instrument is executed on the date first above written.
23. After the assignment to plaintiff of the allowable, the transferor would file a “Monthly Application For Transfer of Allowables For Shut-In Wells Which Produced More Than 100 Barrels of Water Per Day Pursuant To Railroad Commission Order No. 6-10956.” The form on which this application was filed required the transferor to state the total allowable transferred, the amount previously allocated, the amount to be produced in the ensuing month, and the balance remaining. An affidavit attached to this form required the transferor to state (among other things) that “Applicant is the owner of lease or leases on which a well or wells, as identified herein, have been tested for the purpose of being shut-in and the allowable transferred for production from another well or wells in the East Texas Field,” and that the “lease or leases are in force and effect.” The form also contained the following statement:
APPROVAL BY RAILROAD COMMISSION
The above application is approved, this the_ day of_19-
The allowable set forth above supersedes all previous allowables set for this well or wells irrespective of the manner in which such previous allowables were set, unless otherwise noted.
This approval of application constitutes authority for the purchaser or gatherer of oil produced from this well or wells to take the allowable production accumulating *263 or accumulated from the effective data above shown until the issuance of a new schedule in which the allowable for this well or wells will be included. The presentation of this approved application in support of an SW-2 will be authority for the clearance of such accumulated production.
Deputy Supervisor, Railroad Commission of Texas.
District Engineer, Railroad Commission of Texas.
24. With the approval of the Texas Eailroad Commission, plaintiff could apply transferred allowables to any of its wells in the East Texas Field to increase the rate of production of such wells, provided the wells were producing no more than 25 per cent salt water, and provided that no well would be allowed to produce a total of more than six barrels per producing day of such transferred allowables. In some instances, the allowables were transferred to and produced from a well on a lease of plaintiff within 1,000 feet of a shut-in well; in other instances, the distance was as much as 23 miles. There was no particular pattern followed by plaintiff in selecting the well or wells to which the allowables were transferred.
25. The molecules of oil underlying the transferors’ leases at the time their wells were shut in did not migrate to plaintiff’s wells and in no instance did plaintiff produce from its wells the same molecules of oil which were under the trans-ferors’ leases at the time the transferors’ wells were shut in.
26. The relationship of plaintiff’s production of oil under transferred allowables to. (1) plaintiff’s total production of oil in the East Texas Field and (2) to the total production of oil by all producers in the East Texas Field is as follows:
Year Total Produced by All Producers (bbls.) Total Produced by Plaintiff Under Salt Water Shut-in Transferred Allowables Purchased (bbls.) Total Produced by Plaintiff in East Texas Field (bbls.)
1953. 90,636,857 351,680 4,792,579
1954. 81,362,615 289,138 4,248,397
1955. 79,855,478 220,777 4,108,187
1956. 77.016,359 191.833 3.946.734
*264 This table shows, for example, that in 1963 Tidewater’s total production of oil under transferred allowables accounted for about 7.3 per cent of its total production of oil and about 0.4 per cent of the total production of oil by all producers in the field.
27. After the term of the transferred allowable has expired and the full allowable produced, the transferor may reopen the well after a 24-hour production test conducted by the Texas Railroad Commission. If the test indicates that the well can produce additional oil, the well is put back on production and granted a new allowable. However, no bonus allowable is granted for reinjection of salt water and the new allowable cannot again be transferred.
28. During the 15-year period from 1949 to 1964, 3,817 wells were put on the decline curve and their allowables transferred. Of these 3,817 wells, only 46 were known to have been retested, and all 46 were restored to production. These 46 wells were located across the entire length of the field. The average production of these 46 wells at the time they were shut in and their allowables transferred was 13.68 barrels of oil per day. When reopened, after being shut in an average period of 39 months, the average production of the 46 wells was 13.52 barrels of oil per day. Their average production thereafter was as follows:

Barrels Per Day

6 months after start up_12. 89
12 months after start up-12.26
18 months after start up_10. 90
24 months after start up-10. 61
30 months after start up-10.21
36 months after start up- 9.65
42 months after start up- 8.74
29.Of the 46 wells reopened and restored to production, eight were wells from which allowables had been transferred to plaintiff. The production of those eight wells at the time *265 they were shut in and at the time they were restored to production was as follows:
Operator Lease Production Production Well at at No. Shut-in Restoration, (bbls.) (bbls.)
Pleas Dawson_ Blackwell- 5 11.47 7.62
H. W. Donnell. C. O. Crim. 3A 17.67 20.00
Register_ 1 13.30 10.60
Register_ 2 9.70 11.00
Smith. 4 10.64 14.30
S. S. Laird. Peterson.... 4 16.76 20.00
Julian Potter.._ John Bell_ 3 12.31 20.00
Gilcrease.-_ T. W. Lee_._ 11 14.00 10.43
30. During the period in issue here, 1953 through 1956, plaintiff produced oil under allowables transferred to it from 222 shut-in wells. Of these 222 wells, only six wells were restored to production after the transferred allowable expired.
31. During the period 1949 to 1964, plaintiff put some of its own wells on the decline curve and transferred the allowable to other of its own wells. Plaintiff did not reopen any of these wells after the allowable expired. Plaintiff does not transfer an allowable until it has tested the various layers of oil-bearing sand which may lie beneath its wells and has gleaned all the oil therein to the best of its ability. Thus, plaintiff puts the well on the decline curve as a last resort— when the well is at its last producing stage. Most operators follow the same practice of trying to capture all the oil underneath their well before putting it on the decline curve.
32. Some operators shut in their wells because of poor well performance, high lifting costs, worn condition of existing equipment, poor recompletion costs, inability to dispose of the excess salt water, the number of other wells on the same lease, and lack of operating know-how. These same factors, of course, exist at the expiration of the transferred allowable. There is the added factor that under the Railroad Commission’s Order no bonus allowable is granted for reinjection of the salt water from a reopened well. These considerations *266 would indicate why some operators would not reopen shut-in wells after the allowables expired.
33. Oil may be located in different layers of sand beneath a well. These layers vary in permeability so that the rate of movement in one layer may be faster or slower than in another layer. Most operators have located and produced from all the layers underlying their wells before they shut their wells in and transfer the allowables.
34. One of the 46 wells referred to in finding 28 had a producing rate of 4.13 barrels of oil per day at shutdown and a producing rate of 20 barrels per day 12 months after restoration. This sharp increase in production indicates that after restoration the operator probably recompleted the well in a different layer from which he had been producing prior to shutting in bis well. However, there was no such large increase in production capacity on the other wells, particularly in the critical period between shut in and restoration. Moreover, as set forth previously, most operators have located and produced from all the layers underlying their wells before they shut the wells in and transfer their allowables. These considerations indicate that it is an unusual situation for an operator to recomplete his well from a layer from which he had not been producing before the transfer of the allowable.
35. In computing the amount claimed for percentage depletion on its 1953 through 1956 federal income tax returns, Elm Oil Company — one of the transferors — included in gross income from its property the amounts received from plaintiff with respect to the transferred allowables and excluded the amounts paid as royalties to its royalty owners. Elm Oil Company made payments to the owners of the royalty interests in wells Nos. 2 and 3 of the L. L. Jones Lease of one-eighth of the amounts received from plaintiff. The report of the revenue agent shows no adjustment with respect to this item.
36. Pursuant to the terms of its leases, plaintiff paid the owners of the land a royalty, usually one-eighth of the production, for each barrel of oil produced from each well located on the leased property, including each barrel of oil produced under the transferred allowables. The royalty paid *267 was computed on the posted price of crude oil in the field at the time of production, i.e., $2.65 or $2.90 per barrel during the years 1952 through 1956. The royalty plaintiff paid to the owners of the land on the oil produced under the transferred allowables was excluded by plaintiff from its depletion base in determining its federal income tax. The payment of the royalty to the owners of the land and the exclusion of such amounts from plaintiff’s depletion base were done for the years 1952 through 1956, as well as all other years.
37- With respect to the calendar years 1953 through 1956, plaintiff paid to the transferors of allowables acquired by it, as described in finding 20, in accordance with its contracts with the transferors, the following sums:
1953_$754,815.02
1954_ 650,456. 04
1955_ 496,751.16
1956_ 431, 626.12
38. In its federal income tax returns for 1953 through 1956, plaintiff in computing its percentage depletion base (i.<?., “gross income from the property”) did not exclude therefrom, as rents or royalties, the amounts (set out in finding 37) paid to the transferors of the allowables. This is to say that plaintiff included in its depletion base for the years in issue the amounts paid to the transferors for the transfer of their allowables. Also, in arriving at net income for such years, plaintiff deducted such amounts as expenses for the years in which it paid them.
39. In determining the amount of “gross income from the property” for 1953 through 1956, the Commissioner of Internal Revenue treated the sums in finding 37 as exclusions from plaintiff’s gross income and thereby reduced plaintiff’s base on which its percentage depletion was computed.
40. The parties agreed that the amount of plaintiff’s recovery, if any, will be reserved for further proceedings under Rule 47(c).

Ultimate Findings

41. Defendant has failed to prove that the oil underlying plaintiff’s wells was not depleted by plaintiff’s production from those wells pursuant to the transferred allowables.
*268 42. Defendant has failed to prove that the oil underlying any of the transferors’ leases decreased during the life of the transferred allowables. The following facts indicate rather that the oil under the transferors’ leases did not decrease during the period the allowables were transferred:
(a) The water movement from west to east is extremely slow and is hardly discernible during the life of a transferred allowable which is about three years ;
(b) The East Texas Field is not a pool or basin and cannot be tapped with equal facility by all the wells in the field;
(c) By the time a well produces 100 barrels of water a day, which is a condition precedent to the transfer of an allowable, the encroaching water has already swept to the east substantially all the oil that is going to be swept from the vicinity of the well and the oil that remains is by-passed oil producible from a practical standpoint only by that well or other wells in its immediate vicinity;
(d) There are numerous geological factors which trap the by-passed oil and prevent it from being swept to the east by the encroaching water;
(e) There are over 40 islands located west of the plugged and abandoned line and across the entire length of the field, each of which contained wells producing oil in 1960;
(f) Of the 46 shut-in wells that are known to have been reopened, all 46 still had substantial oil beneath them. In fact, the average production of the 46 wells at shut in was 13.68 barrels per day as compared to 13.52 barrels per day on restoration to production. These 46 restored wells are located across the entire length of the field;
(g) There were eight wells from which allowables had been transferred to plaintiff which were reopened after the allowables expired. When they were reopened, they all produced at a comparable level of production as they did when they were shut in.
43. Even if it were to be assumed that oil beneath the transferors’ leases decreased during the life of the transferred allowables, defendant has failed to prove that plaintiff’s production pursuant to the transferred allowables was the cause of the decrease.
*269 44. Plaintiff’s production of oil during the years 195S through 1956 from its own wells pursuant to the transferred allowables depleted plaintiff’s oil.
CONCLUSION OE LAW
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. Computation of the amount of recovery will be determined pursuant to Rule 47 (c).
In accordance with the opinion of the court, a stipulation of the parties, and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on October 25, 1968, that judgment for the plaintiff be entered for $263,884.08.

 under these provisions of the Code, there is allowed as a deduction in computing taxable income from oil and gas wells a depletion allowance of 27% per cent of the gross income from the property, “excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.” Whether the amounts paid by Tidewater to the transferors of the allowables constituted royalties and hence excluded from Tidewater’s depletion computation depends on whether the transferors had an “economic interest” in the oil In place with respect to the oil produced under the allowables. E.g., Palmer v. Bender, 287 U.S. 551 (1933).

 Tidewater Oil Company v. United States, supra, 168 Ct. Cl. at 462, 339 F. 2d at 635. See Palmer v. Bender, supra, 287 U.S. at 557.

 In the prior Tidewater case, the court held that the transferors’ contribution to the development or operation of the oil in place was not such — within the guidelines established by Commissioner v. Southwest Exploration Co., 350 U.S. 308 (1956)-as to give them the requisite “economic interest” in the oil which would entitle them to share in the depletion allowance. 168 Ct. Cl. 457, 465-68, 339 F. 2d 633, 637-39. The court's decision on this phase of the ease has been reaffirmed and applied in CBN Corporation v. United States, 176 Ct. Cl. 861, 364 F. 2d 393 (1966), cert. denied, 386 U.S. 981 (1967). See also Paragon Jewel Coal Co. v. Commissioner, 380 U.S. 624 (1965). Collateral estoppel does not bar re-examination of the issue, however, since in the later tax years involved here Tidewater executed 48 new assignment contracts which are separable from those involved in the first proceeding. Commissioner v. Sunnen, 333 U.S. 591, 601-02 (1948).

 The Railroad Commission’s order requiring a transferor to maintain his lease is seemingly designed to preclude possible double allowables. The trans-feror became entitled to an allowable while it was operating the lease which had now been shut in. The allowable has been transferred. If the transferor abandoned its lease and the landowner leased to another operator, there would be a double allowable. This is prevented by requiring the lease to be maintained during the life of the transfer.