H. J. FREEDE AND JOSEPHINE W. FREEDE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ROGER S. FOLSOM AND MARY M. FOLSOM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16339-82, 20768-82.     Filed March 11, 1986.

*Terry R. Hanna*, for the petitioners in docket No. 16339-82.

*Donald R. Lisle*, for the petitioners in docket No. 20768-82.

*Osmun R. Latrobe*, for the respondent.

OPINION

GOFFE, *Judge:** The Commissioner determined the follow-

---

*By order of the Chief Judge, this case was reassigned from Judge Charles E. Clapp II, to Judge William A. Goffe.

ing deficiencies in petitioners' Federal income taxes for the taxable years 1978 and 1979:

| Petitioner | Taxable year | Deficiency |
|---|---|---|
| H. J. and Josephine W. Freede | 1978 | $105,758.53 |
| | 1979 | 551,348.33 |
| Roger S. and Mary M. Folsom | 1978 | 8,056.00 |
| | 1979 | 97,444.00 |

The two cases, docket Nos. 16339-82 and 20768-82, were consolidated for trial, briefing, and opinion. The parties have settled numerous adjustments determined by the Commissioner in the statutory notices of deficiency. The sole issue for decision is whether petitioners are required to include in taxable income for the taxable year 1979 amounts received from Oklahoma Gas & Electric (hereinafter referred to as OG & E) pursuant to a "take or pay" Gas Purchase Contract.

All of the facts have been stipulated and the consolidated case was submitted to this Court without trial pursuant to Rule 122.[1] The stipulations of facts and accompanying exhibits are so found and incorporated by reference.

At the time of filing the petitions in this case, H.J. and Josephine W. Freede, husband and wife, and Roger S. and Mary M. Folsom, husband and wife, resided in Oklahoma City, Oklahoma. Petitioners H.J. and Josephine W. Freede filed timely joint Federal income tax returns for the taxable years 1978 and 1979 with the Internal Revenue Service Center in Austin, Texas. Petitioners Roger S. and Mary M. Folsom filed timely joint Federal tax returns for the taxable years 1978 and 1979 with the Internal Revenue Service Center in Austin, Texas. Josephine W. Freede and Mary M. Folsom are parties in this case solely because they filed joint returns with their husbands. H.J. Freede (Freede) and Roger S. Folsom (Folsom) will be referred to jointly as petitioners.

During the taxable years at issue, petitioners were each, in addition to their other income producing activities, in the business of producing oil and gas. They carried out their

[1] All Rule references are to this Court's Rules of Practice and Procedure. All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

business by purchasing fractional working interests in various mineral leases, which were then developed and operated by others. They each had adopted and used the cash receipts and disbursements method of accounting.

During the taxable years at issue, Freede and Folsom held working interests in Endicott No. 1 lease in Blaine County, Oklahoma, of .04362 percent and .013672 percent, respectively. The production from the lease consisted principally of natural gas.

On or about October 28, 1975, a gas purchase contract for the production of natural gas from the Endicott No. 1 lease was entered into between OG & E as purchaser and An-Son Corp. as seller. On or about January 14, 1976, a gas purchase contract for the production of natural gas from the Endicott No. 1 lease was entered into between OG & E as purchaser and A. Ben Chadwell and Julie Racz as seller. Although neither Folsom nor Freede appeared on either contract as parties, both petitioners were bound by, performed, and received performance as sellers under the terms of the contracts. The terms of both contracts are virtually identical, with the exception of slight differences such as the local base prices. All references to the contracts, purchaser, or seller for the remainder of this opinion refer to both contracts and the parties to both contracts, collectively.

The primary terms of the contracts were for 20 years. All of the gas produced and saved from the lease, with minor reservations, was sold to the purchaser.[2] The contracts required that the seller make 100 percent of the deliverability[3] of each well covered by the lease available to the purchaser. The contracts also included a "take or pay" provision which required the purchaser to pay for 80 percent of the deliverability of each well covered by the lease, regardless of whether the purchaser took physical

---

[2]The price paid was set with reference to a local base price, escalating 1 cent per thousand cubic feet each year thereafter, subject to adjustments upwards or cancellation of the contract under certain circumstances.

[3]"Deliverability" is defined in the contracts as the volume of gas attributable to Seller's gas reserves actually delivered to Buyer at the point of delivery against the required delivery pressure during the 24-hour period following delivery of gas at the maximum rate of flow from Seller's wells against the required delivery pressure for a period of 3 days. For convenience, that term will be used in this opinion although, in general terms, it could describe "production" from the wells.

delivery of any gas at all.[4] The amount of gas or substituted payment under the "take or pay" obligation was also referred to as the minimum contract quantity. The seller was obligated to maintain deliverability of 125 percent of the minimum contract quantity.

Under the contracts, if the amounts paid in any taxable year exceeded the amounts attributable to the gas actually taken, OG & E was entitled to an offset for the excess payments in subsequent years to the extent that the gas taken in later years exceeded the minimum contract quantity. Thus the purchaser was not obligated to pay for the gas taken in future years until the value of the gas taken exceeded both the minimum contract quantity payments for that year and the excess payments made in earlier years. So long as the purchaser continued to make minimum payments, the contracts did not require that the purchaser take even a minimum of gas in any particular year. If the payments exceeded the value of the gas taken, however, the purchaser's only right of recoupment was from the production of gas in excess of the minimum contract quantities in future years. The purchaser's right of recoupment or recovery was protected, however, by the fact that OG & E could require that the seller produce gas in an amount equal to 100 percent of the deliverability of each well covered by the lease, or 25 percent in excess of the minimum contractual amounts.

Pursuant to the contracts, the purchaser made the minimum payments to the seller in the taxable year 1979 calculated with reference to 80 percent of the deliverability of each well covered by the lease, as set forth by the contracts. A portion of the payment was for gas actually taken under the contracts. As the amount of gas taken was not equal to or more than the minimum contract quantity, a portion of the minimum contract amount paid under the terms of the contracts was for the difference between the gas taken and the minimum contract quantity of gas. Under the terms of the contracts, OG & E was, therefore, not obligated to pay for gas taken in subsequent years in excess

---

[4]The "take or pay" obligation was reduced in the event that the seller was unable to maintain normal deliverability. In that case, the purchaser was required only to take or pay for 80 percent of the production actually made available to the purchaser.

of the minimum contract rate until the amounts paid in 1979 were offset by the additional gas taken. In 1979, the lease had sufficient projected reserves to repay OG & E in gas, prior to the expiration of the contracts, for the contractual minimum payments paid for gas not taken.

As owners of portions of the working interest, Freede and Folsom received payments from OG & E in the taxable year 1979 in the respective amounts of $462,881.30 and $205,963.44. The amounts received represented both payments for gas actually taken by OG & E and payments for the difference between the amount OG & E was contractually obligated to pay for and the volume of gas actually taken. The respective amounts are as follows:

| Type of payment | Freede | Folsom |
|---|---|---|
| Payments for gas taken | $119,626.14 | $64,802.26 |
| Payment for the difference between minimum contractual payment and payment made for gas taken | 343,255.16 | 141,161.18 |
| Total payments to petitioners | 462,881.30 | 205,963.44 |

The amounts representing payments for gas actually taken by OG & E were included as income by petitioners on their respective Federal income tax returns for the taxable year 1979. The payments made pursuant to the contractual minimum that represented advance payments for gas not taken were not included by either petitioner as income for the taxable year 1979. Both petitioners decided to include in income for later taxable years payments for gas taken by OG & E during those years in excess of the minimum contract quantity.

Petitioners contend that the advance payments received under the "take or pay" contracts with OG & E create an economic interest entitling OG & E to production payments under section 636(a). If the advance payments are an investment in future production, the minimum contract payments paid for gas not taken in 1979 would be treated as loans from OG & E to petitioners, with income recognized only when the gas is actually delivered in subsequent years. Respondent contends that the entire amounts received from OG & E constitute realized income which should be recog-

nized under section 61(a) and section 451,[5] citing Rev. Rul. 80-48, 1980-1 C.B. 99.

A production payment, in general terms, is a right to minerals in place that entitles its owner to a specified share of production for a limited time from a specified mineral property when production occurs. Sec. 1.636-3(a)(1), Income Tax Regs.; see H. Rept. 91-413 (1969), 1969-3 C.B. 200; S. Rept. 91-552 (1969), 1969-3 C.B. 423; F. Burke & R. Bowhay, Income Taxation of Natural Resources, par. 2.07, at 206 (1985). A "carved-out" production payment arises where the owner of an interest in a mineral property assigns a production payment to another person but retains his interest in the property from which the production payment is assigned. If such a production payment is created, section 636(a) describes the tax consequences:

SEC. 636(a). CARVED-OUT PRODUCTION PAYMENT.—A production payment carved out of mineral property shall be treated, for purposes of this subtitle, as if it were a mortgage loan on the property, and shall not qualify as an economic interest in the mineral property. * * *

It is important to the discussion which follows to point out that section 636(a) and the regulations thereunder require first that the production payment be an actual economic interest, and then that the production payment be treated as a loan for Federal income tax purposes rather than the economic interest that it is.

Sections 1.636-3(a)(1) and (2), Income Tax Regs., further define the term "production payment":

(a) *Production payment.* (1) The term "production payment" means, in general, a right to a specified share of the production from mineral in place (if, as, and when produced), or the proceeds from such production. Such right must be an economic interest in such mineral in place. It may burden more than one mineral property, and the burdened mineral property need not be an operating mineral interest. Such right must have an expected economic life (at the time of its creation) of shorter duration than the economic life of one or more of the mineral properties burdened thereby. A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral

---

[5]Sec. 61(a) provides that gross income includes all income from whatever source derived. Sec. 451(a) provides that:

The amount of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

property is not an economic interest in mineral in place. A production payment may be limited by a dollar amount, a quantum of mineral, or a period of time. A right to mineral in place has an economic life of shorter duration than the economic life of a mineral property burdened thereby only if such right may not reasonably be expected to extend in substantial amounts over the entire productive life of such mineral property. The term "production payment" includes payments which are commonly referred to as "in-oil payments", "gas payments", or "mineral payments".

(2) A right which is in substance economically equivalent to a production payment shall be treated as a production payment for purposes of section 636 and the regulations thereunder, regardless of the language used to describe such right, the method of creation of such right, or the form in which such right is cast (even though such form is that of an operating mineral interest). Whether or not a right is in substance economically equivalent to a production payment shall be determined from all the facts and circumstances. * * *

The production payment, is then, under the terms of section 636(a), treated as a loan, as set forth in section 1.636-1(a)(1)(ii), Income Tax Regs.:

The payer of a production payment treated as a loan pursuant to this section shall include the proceeds from (or, if paid in kind, the value of) the mineral produced and applied to the satisfaction of the production payment in his gross income and "gross income from the property" (see section 613(a)) for the taxable year so applied. The payee shall include in his gross income (but not "gross income from property") amounts received with respect to such production payment to the extent that such amounts would be includible in gross income if such production payment were a loan. The payer and payee shall determine their allowable deduction as if such production payment were a loan. * * *

The treatment of the advance payments and the resultant tax consequences depend upon whether or not such payments are an investment in future production that create a production payment constituting an economic interest under sections 631 and 636. Applying the Code and regulations to this case, the question is whether the advance payments from OG & E to petitioners which create a right in OG & E to share in the future production of gas are, under section 636(a), treated as production payments. If so, then the payments to petitioners by OG & E would be characterized under section 636(a) as loans from OG & E to petitioners which would not be taxable to petitioners in the year before the Court.

The criteria that must be satisfied under the terms of the statutes and regulations set forth above are: (1) the purchaser must have a right to a specified share of production or the proceeds from such production; (2) the interest must have an expected economic life (at the time of its creation) of shorter duration than the economic life of the mineral property upon which it is a burden; (3) the right must be an economic interest in the mineral in place; (4) the interest must not be able to be satisfied by other than the production of mineral from the burdened mineral property; and (5) the production payment must be limited by either a dollar amount, a quantum of mineral, or a period of time. In this case, each of the criteria has been met.

The contracts provide that the purchaser is entitled to the entire production of the lease, and is required to take or pay for 80 percent of the deliverability of each well covered by the lease. The sellers agreed to maintain deliverability and production of each well at 100 percent, which is 125 percent of the minimum contract quantity. OG & E clearly has the right to a specified share of the production from the lease, thus satisfying the first criterion.

The second criterion has also been met in that OG & E can recoup the amounts paid for gas not received from the projected reserves prior to the termination of the contracts. The economic life of the interest created by the advance payments is thus limited to the terms of the contracts, which are shorter than the economic life of the property.

The third criterion, however, is the principal point upon which the parties disagree. In order for the advance payments to be treated as an investment in future production by OG & E rather than as income to petitioners, payments made pursuant to the contracts must create a depletable economic interest as defined in section 1.611-1(b)(1), Income Tax Regs.:

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for the return of his capital. For an exception in the case of certain mineral production payments, see section 636 and the regulations thereunder. A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely

because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. * * *

Petitioners contend that OG & E acquired an economic interest in the gas in place by virtue of the rights and obligations under the "take or pay" contracts. Respondent argues the converse, proposing that OG & E had merely a contractual right to receive the gas, not a property interest in the gas itself; OG & E had at best an "economic advantage," not an "economic interest."

Although section 1.611-1(b), Income Tax Regs., purports to adequately define the term "economic interest," a number of cases have expanded upon the vague meaning of the term. Even the courts, however, have found it difficult to single out one recurring factor that clearly indicates ownership of an economic interest in the minerals in place. *Tidewater Oil Co. v. United States*, 168 Ct. Cl. 457, 339 F.2d 633 (1964).

The purchaser need not have legal title to the property to have an economic interest:

It is enough if, by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so he has an economic interest in the oil, in place, which is depleted by production. * * * [*Palmer v. Bender*, 287 U.S. 551, 557 (1933).]

A taxpayer has an "economic interest" in minerals regardless of the legal form of the interest if he has acquired the interest by investment in the minerals in place, and looks to the extraction of the minerals for the return of his investment. *Gulf Oil Corp. v. Commissioner*, 86 T.C. 115, 136 (1986); Thomas v. Perkins, 301 U.S. 655, 661 (1937). See also Weaver v. Commissioner, 72 T.C. 594 (1979).

For an interest to be an economic interest within the terms of section 636(a), the payments must be in exchange for the receipt of minerals and there must also be an investment in the production of the minerals. *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981); *Weaver v. Commissioner, supra.* Thus, where the taxpayer was merely a processor of oil and was not engaged

in production, the taxpayer had no interest in the mineral in place. The fact that the taxpayer obtained an economic advantage from the production of the gas was not adequate basis for the creation of an economic interest. *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 367-369 (1938). "The test * * * is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted." *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603 (1946). "Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil." *Kirby Petroleum Co. v. Commissioner, supra* at 604; *Gulf Oil Corp. v. Commissioner, supra.*

Although the cases cited above repeatedly conclude that title is not required as a prerequisite to an economic interest, no taxpayer was found to possess an "economic interest" who did not also hold either a fee interest or a leasehold interest in the mineral property until *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308 (1956). The taxpayers were fee owners of upland adjoining property that the State of California required that the operator use for access, by means of slant drilling, to the offshore mineral properties. The taxpayers granted the operator the right to drill in exchange for a net profits interest, and subsequently claimed depletion on the amounts received. The Supreme Court held that the taxpayers, although neither owners of the fee interest nor lessors of the minerals, had an "economic interest" upon which they were entitled to depletion. In so holding, the Court held:

It is true that the exclusive right to drill was granted to Southwest, and it is also true that the agreements expressly create no interest in the oil in the upland owners. But the tax law deals in economic realities, not legal abstractions, and upon closer analysis it becomes clear that these factors do not preclude an economic interest in the upland owners. [350 U.S. at 315.]

Respondent contends that the facts of this case are indistinguishable from *Helvering v. Bankline Oil Co., supra.* In that case, the taxpayer was merely a processor of the mineral and possessed no other rights whatsoever with respect to the mineral in place. The Supreme Court found that Bankline was afforded only "economic advantage" by

virtue of the contract, rather than an economic interest in the minerals in place. 303 U.S. at 367. Respondent argues that OG & E also has no more than an economic advantage derived from the mere processing of the minerals made available to it under the contracts. Respondent's conclusion is that OG & E cannot, therefore, satisfy the third requirement for a production payment under section 636 because an economic advantage is not equivalent to an economic interest.

Petitioners argue that OG & E's interest in the production of gas from the lease rises to the level of an economic interest, due to the contractual rights and obligations of OG & E. We agree with petitioners.

Under the contracts, OG & E has the obligation to take or pay for 80 percent of the deliverability of each well covered by the lease. OG & E, however, also has the right to require the producers to maintain production equal to 100 percent of the deliverability of each well, or an amount equal to 125 percent of the minimum contract quantity. If OG & E pays an amount in excess of the value of gas actually taken, it has the right to offset the payments against any amounts produced in subsequent years in excess of the applicable minimum contract quantity. OG & E, in essence, has both rights to the minerals in place and a means of controlling production. Although OG & E did not have legal title to the minerals, title is not the controlling factor. *Kirby Petroleum Co. v. Commissioner*, *supra* at 604. When the rights and obligations of OG & E under the contracts are viewed in their entirety, they rise to the equivalent of an economic interest under the statute, regulations, and case law.

The fourth factor that must be satisfied under section 1.636-3(a)(1), Income Tax Regs., for the payments to be treated as production payments is that the advance payments must be satisfied only from the production of mineral from the burdened property. Under the contracts, OG & E pays an amount each year equal to 80 percent of the deliverability of each well covered by the lease, whether or not it takes the minimum contract quantity of gas. The only method by which OG & E can obtain value for the payments made is to take an additional amount of gas over the minimum contract quantity in future years. Further, the

sellers are required to produce the gas which will repay OG & E for the amounts previously paid. OG & E has no other source for repayment other than the future production of gas from the lease specified in the contracts. The fourth criterion has been satisfied.

The final criterion is that the production payment must be a specified share of production limited by either a dollar amount, a quantum of mineral, or a period of time. In this case, the contracts provide that the advance payments are the equivalent of advance payment for gas to be received later. In each year, OG & E must take or pay for 80 percent of the deliverability of the wells. In years when OG & E takes gas that it has previously paid for, that deliverability must come from the remaining 20 percent of production. Only the excess production above that amount can be used for recoupment of the advance payments. OG & E can, however, compel production of that final 20 percent of production, otherwise defined as 125 percent of the minimum contract quantity. The amount of gas delivered is limited by the maximum amount of deliverability that can be imposed by OG & E, and is further limited by the fact that the contracts have a 20-year term within which OG & E must, if at all, recoup the advance payments from production. The fifth criterion is also satisfied under the facts of this case, and the requirements for a production payment as set forth in the statute and regulations thereunder have been met.

Respondent's final argument, however, is that Rev. Rul. 80-48, 1980-1 C.B. 99, sets forth the proper approach toward "take or pay" gas contracts and that such contracts create no more than an economic advantage. Rev. Rul. 80-48, *supra*, describes a "take or pay" gas purchase contract similar to the factual situation here: Y purchases a specified amount of gas from the taxpayer each month, but pays whether or not Y chooses to take the entire monthly production. Any advance payments made by Y create a right to future excess production without additional payment. The authors of the revenue ruling conclude that:

An agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production does not convey a depletable economic interest in mineral in place.

The taxpayer, in this case, entered into an agreement with Y under the terms of which Y must purchase each month, for the life of the contract, a specified amount of gas. However, Y need not take the gas. Under the provisions of section 1.611-1(b) of the regulations such an agreement does not convey a depletable economic interest in mineral in place.
[1980-1 C.B. at 99-100.]

A revenue ruling is no more than a statement of the Commissioner's position, and is "not entitled to any particular weight." *Anselmo v. Commissioner*, 80 T.C. 872, 883 n. 13 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The Fifth Circuit has further described the value of a revenue ruling:

A ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts. It does not have the effect of a regulation or a Treasury Decision. [*Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146-1147 (5th Cir. 1971).]

The support offered for the conclusion drawn in the revenue ruling is section 1.611-1(b), Income Tax Regs., which provides that an agreement for purchase upon production is not a conveyance of a depletable economic interest in mineral in place.[6] As pointed out above, however, the "take or pay" contracts at issue in this case are not merely agreements to purchase if production occurs. OG & E has a right of recoupment for the advance payments limited solely to future production of minerals and may compel production to satisfy the recoupment rights created by the advance payments. In essence, the purchaser has acquired by investment (the advance payments) an interest in the gas in place, which may be satisfied solely from the minerals extracted, thus fulfilling the definition of an economic interest under section 1.611-1(b)(i), Income Tax Regs.

[6]This revenue ruling has been discussed and in some cases criticized in oil and gas taxation texts and periodicals. See 2 L. Fiske, Federal Taxation of Oil & Gas Transactions, sec. 8.12 (1983); 1 Energy Resources Tax Reports (CCH) pars. 651-653 (1983); C. Russell & R. Bowhay, Income Taxation of Natural Resources (P-H), par. 15.15, at 1519-1520 (1986); A. Bruen & W. Taylor, Federal Income Taxation of Oil & Gas Investments, par. 8.07[6][a] (1983 & Supp. 1985); Emery, "Current Developments in Oil and Gas Taxation," 32d Ann. Inst. on Oil & Gas L. & Taxation 335, 352-353 (1981); Hasche, Crump & Huggins, "Mineral Production Payments; Gas 'Take or Pay' Purchase Contract," 28 Oil & Gas Tax Quarterly 564 (1981); Burke & Karpen, "New Revenue Ruling 80-48: A Blueprint for Recreating Carved-out Production Payments?" 53 J. Taxation 370 (1980).

We hold that a production payment as defined by section 1.636-3(a), Income Tax Regs., has been created, and the payments received in 1979 in excess of payments for gas delivered, are not taxable in 1979.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, PARKER, WHITAKER, HAMBLEN, COHEN, CLAPP, SWIFT, and WRIGHT, *JJ.*, agree with the majority opinion.

WILBUR, KÖRNER, SHIELDS, and GERBER, *JJ.*, did not participate in the consideration of this case.

---

NIMS, *J.*, dissenting: I respectfully dissent, since I cannot agree that OG & E obtained a depletable economic interest in minerals in place as required by the regulations. Sec. 1.636-1(a)(1)(i); sec. 1.611-1(b), Income Tax Regs. Unless this paramount condition is met there is no production payment to which section 636(a) can apply.

A paradigm form of production payment is illustrated by the facts in *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958). The Supreme Court summarized the facts as follows:

Lake is a corporation engaged in the business of producing oil and gas. It has a seven-eighths working interest in two commercial oil and gas leases. In 1950 it was indebted to its president in the sum of $600,000 and in consideration of his cancellation of the debt assigned him an oil payment right in the amount of $600,000, plus an amount equal to interest at 3 percent a year on the unpaid balance remaining from month to month, payable out of 25 percent of the oil attributable to the taxpayer's working interest in the two leases. At the time of the assignment it could have been estimated with reasonable accuracy that the assigned oil payment right would pay out in three or more years. It did in fact pay out in a little over three years. [356 U.S. at 261-262].

The legislative history of section 636(a)(enacted in 1969) makes it clear that the section was a legislative response to certain perceived tax avoidance schemes following in the wake of *P.G. Lake.* See S. Rept. 91-552, 1969-3 C.B. 423, 538. For example, by certain maneuvering with production payments taxpayers were said to be able to avoid the 50-percent taxable income limitation for percentage deple-

tion purposes, the foreign tax credit limitation, the 5-year net operating loss carryover limitation, and the seven-year investment credit limitation. Taxpayers were also seen as being able to amortize or pay off what was essentially a loan with before-tax dollars. 1969-3 C.B. at 539.

The congressional response, as reflected in section 636(a), was to provide that production payment transactions in general are to be treated as loan transactions. I do not believe, however, that by taking this step to close one loophole Congress intended to open another. I agree that the form of a production payment transaction and that of a mortgage loan need not be precise analogues as the regulations themselves make clear.[1] Nevertheless, taxpayers must always make a threshold showing that the rights conveyed were a production payment; i.e., a depletable economic interest in minerals in place. I think petitioners have failed in their attempt to do so in this case.

As the regulations make clear, "an economic interest is possessed in every case in which the taxpayer [e.g., OG & E] has *acquired by investment* any interest in *mineral in place* * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * *, to which he [OG & E] must look for a return of his capital." (Emphasis added.) Section 1.611-1(b)(1), Income Tax Regs.[2] By this definition, OG & E must have acquired the gas as an investment and be recovering its capital through sales to third parties. That is not, in fact, what happened. It seems plain to me that OG & E is simply buying petitioners' gas at the wellhead, not mineral in place. OG & E then presumably transports the gas through its pipeline to its processing plant, for later sale to consumers.

I think this case is controlled by the Supreme Court's decision in *Helvering v. Bankline Oil Co.*, 303 U.S. 362 (1938). One of the contracts involved in *Bankline* provided

---

[1]Sec. 1.636-3(a)(2), Income Tax Regs., provides that "A right which is in substance economically equivalent to a production payment shall be treated as a production payment for purposes of section 636 and the regulations thereunder, regardless of the language used to describe such right, the method of creation of such right, or the form in which such right is cast (even though such form is that of an operating mineral interest)."

[2]Sec. 1.611-1(b)(1), Income Tax Regs., has been characterized as having been drawn primarily from the opinions in *Palmer v. Bender*, 287 U.S. 551 (1933), and *Helvering v. Bankline Oil Co.*, 303 U.S. 362 (1938). See 1 B. Bittker, Federal Income Taxation of Income, Estates and Gifts, par. 24.1.2, at 24-7 (1981 ed.).

for the purchase by the taxpayer from the producer of "all natural gas produced at a given well, the [taxpayer] paying 33 1/3 percent of the gross proceeds received by it from the sale of the gasoline extracted from such gas." The Supreme Court quoted with approval the Government's representation that "under the contracts [taxpayer] took no part in the production of the * * * gas, conducted no drilling operations upon any of the producing premises, did not pump oil or gas from the wells, and had no interest as a lessor or lessee, or as sublessor or sublessee, in any of the producing wells." 303 U.S. at 365. The purchaser [taxpayer] merely attached pipelines to the various wells and carried the gas from those wells to its processing plant where the gas was commingled with gas from other sources.

The Supreme Court pointed out in *Bankline* that "Some of the contracts, reciting that the producer was the owner of the gas produced, provided for its treatment [i.e., reduction of dry gas to gasoline] by [taxpayer]. Other contracts were couched in terms of purchase. In either case the gas was to be delivered to [taxpayer] at the casingheads or gas traps installed by the producer." 303 U.S. at 367-368.

The Court went on to say that "The controlling fact is that [purchaser] had no interest in the gas in place. [Purchaser] had no capital investment in the mineral deposit which suffered depletion and is not entitled to the statutory allowance." 303 U.S. at 368.

I believe that OG & E is in exactly the same posture here as was the purchaser-taxpayer in *Bankline Oil Co.* The contracts in this case speak in terms of gas "sold and delivered" to OG & E. Section 2.2 provides that "Seller [petitioners] shall have the right to operate wells from which gas is produced * * * for delivery "into Buyer's pipeline [i.e., OG & E's pipeline.]" Article 5, entitled "Points of Delivery and Delivery Pressure," provides that the gas produced "shall be delivered at the wellhead of each well, or at the outlet of the well separator, if any. *Title to all gas sold hereunder shall pass from Seller to Buyer at said point of delivery.*" (Emphasis added.) There is absolutely nothing in either contract which says anything about OG & E making a capital investment in the gas in place. It follows, then,

that this case simply does not involve production payments, and section 636(a) does not apply.

Section 61(a) provides that "gross income means all income from whatever source derived." Section 451 provides that "The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." Under the facts of this case, the $484,416.34 received by petitioners in the years before the Court, and which the majority permits petitioners to defer for up to 20 years, should be included in petitioners' gross income in the years received, and I would so hold.

JACOBS, PARR, and WILLIAMS, *JJ.*, agree with this dissent.

---

PARR, *J.*, dissenting: In addition to the reasons articulated in the dissenting opinions of Judges Nims and Williams, in which I have joined, I dissent on an additional ground. What the majority has done here in holding that OG & E possesses an economic interest in the mineral in place extends the concept of "economic interest" much too broadly, and may provoke unforeseen consequences. This concept is fundamental in determining the tax consequences of transactions involving mineral properties. In particular, it is critical in determining who receives gross income from the property, who is entitled to depletion, and whether the disposition of an interest is a sale or a lease.

The majority's opinion has the result of elevating a prepaid contractual right to a supply of a mineral to the level of an investment in the mineral in place, an economic interest. In this case, the majority's finding of an economic interest leads to the finding that a production payment exists, which is treated not as a depletable economic interest but as a loan, pursuant to section 636. It might be argued in this context that there has been no shifting of ordinary depletable income and thus little or no abuse in terms of tax dollars as a result of this decision, if both

parties reported the transaction consistently.[1] However, in other contexts the finding that such a contractual right amounts to an economic interest may have a greater tax impact, such as entitlement to depletion deductions. Moreover, what the Court has done today is to mischaracterize a straightforward transaction, the tax consequences of which were clearly and correctly stated in Rev. Rul. 80-48, 1980-1 C.B. 99, and to open the door to the possible distortion of the tax consequences of all transactions involving natural resources.

NIMS, *J.*, agrees with this dissent.

---

WILLIAMS, *J.*, dissenting: The crux of this case is whether OG & E has an economic interest in the gas *in place*. I submit that it does not. At most, OG & E has secured for itself the economic advantage of a long-term, stable supply of gas. As a consumer and not as an investor, it has prepaid for future deliveries to maintain both that supply and its good relations with the supplier. OG & E has the right to command delivery to itself of any gas, *once extracted*, that meets certain specifications of the contract. In my view, that contractual right does not constitute an economic interest in the gas in place notwithstanding that OG & E might well take all of the gas extracted.

In *Palmer v. Bender*, 287 U.S. 551 (1933), the Supreme Court, faced with defining a depletable interest in minerals, stated as follows:

> The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, *by investment, any interest in the oil in place*, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital. [287 U.S. at 557. Emphasis added.]

This language means that (a) the taxpayer must have a legal right to the mineral in the ground, (b) that right must be acquired by investment, and (c) a return of the taxpay-

---

[1]The record is silent with regard to OG & E's actual treatment of the payments. However, the majority opinion would preclude OG & E from deducting the payments to petitioners, and would require OG & E to report imputed interest on the amount treated as a loan. See sec. 1.636-1(a), Income Tax Regs.

er's investment must be realized out of income to be derived from extracting the mineral. See also sec. 1.611-1(b)(1), Income Tax Regs.

In this case, OG & E has no legal right to the mineral in the ground; the contract provides that OG & E's legal ownership commences at the point of delivery (i.e., "the wellhead or the outlet of the well separator, if any"). OG & E has prepaid for a quantity of extracted gas that must be delivered to it in accordance with certain quality specifications and at a given pressure. Under the contract if the gas fails to meet quality specifications (e.g., maximum sulfur content), the parties will adjust the price or, failing adequate adjustment, OG & E can exclude such gas from the contract. If the gas fails to meet the pressure specification, section 5.4 of the contract provides that unless either OG & E or the petitioners elect to install the equipment necessary to compress the gas to the acceptable pressure, "the Buyer [OG & E] shall, on request of Seller [petitioners] release the production from any such well, together with the acreage attributable thereto, from the provisions of this agreement." It seems to me that in either circumstance (failure of quality or pressure), OG & E has no interest in the gas in place and no right to any income from the sale of such gas. Further, if production from the well is released, it is unclear whether OG & E can recover any prepayment for the gas or whether the sellers must make up deficient deliveries from other wells.[1] On this basis I believe that OG & E has not invested in this well, but has only prepaid for a commodity to be delivered to it. OG & E's right to the gas begins at the metering station on the pipeline and not in the well.

Furthermore, the price that OG & E pays for the gas is itself a strong indicator that OG & E has not invested in the gas well and does not look to its extraction to recover any

---

[1]The contract is silent. Bearing the risk of such loss (assuming that deficient deliveries are not made up as a business practice), however, can make economic sense. The economic advantage of a stable long-term supply may be worth losing the prepayment, e.g., where the cost of securing the supply on the spot market is higher than the price of long-term supply under the contract (including any forfeited prepayments). The record is apparently barren on this point, and I offer the observation only to counter any speculation that the prepayment must necessarily be an "investment" simply because OG & E in fact paid for gas in 1979 that was not delivered to it.

"investment." The contract price for the gas is determined by reference to the market price paid by OG & E to other contract suppliers of gas of similar quality and pressure from similar formations and locations in identified counties. In general terms, this formula price can be said to reflect the local market price at the wellhead of a particular quality of gas at a given pressure. If the formula works as contemplated it should produce a price that is, within tolerable limits of deviation, the fair market value of such gas after extraction. OG & E is not, therefore, in a position to profit from any resale of this gas at the wellhead. Consequently, OG & E is not seeking a return from extracting the gas; rather, it is a consumer buying a supply of the commodity it consumes.

Finally, section 3.1 of the contract provides that the quantity of the gas to be delivered under the contract is the *lesser of* (a) 80 percent of the well's "deliverability" or (b) "80% of the volume of gas made available by Seller to Buyer." This provision seems to me to undercut the majority's view that "deliverability" and "production" are equivalent terms notwithstanding the seller's obligation under section 2.2 of the contract to operate the wells so that they "will deliver gas into Buyer's pipeline when desired by Buyer at the maximum rate at which said wells are capable of production."

In summary, this agreement is nothing more than a long-term supply contract that gives OG & E some assurance that a relatively stable source of natural gas can be delivered to its pipeline according to its specifications when its needs dictate.

NIMS, JACOBS, and PARR, *JJ.*, agree with this dissent.